1 | UZZELL S. BRANSON III (State Bar No. 46561)
A Professional Corporation
2 | LAW OFFICES OF UZZELL S. BRANSON III
225 South Lake Avenue, Suite 1400
3 | Pasadena, California 91101
Telephone:  (626) 683-8925
4 | Telecopier:  (626) 683-8512

5 | STEPHEN G. AUER (State Bar No. 74101)
ANNA M. SUDA (State Bar No. 199378)
6 | CHRISTENSEN & AUER
225 South Lake Avenue, Suite 860
7 | Pasadena, California 91101
Telephone:  (626) 568-2900
8 | Telecopier:  (626) 568-2911

9 | Attorneys for Defendants Northridge Medical Group, Inc.
and Family/Seniors Medical Group, Inc.

10

```
FILED

SEP 2 4 2007

C........................
CENTRAL DISTRICT OF CALIFORNIA
BY                     Deputy Clerk
```

11 | **UNITED STATES BANKRUPTCY COURT**

12 | **CENTRAL DISTRICT OF CALIFORNIA**

13 | **SAN FERNANDO VALLEY DIVISION**

14 | In Re MERIDIAN HEALTH CARE ) Case No. SV 06-10733-GM
SERVICES, INC., a Delaware corporation )
15 | ) Chapter 7
⎯⎯⎯⎯⎯⎯⎯⎯Debtor.⎯⎯⎯⎯⎯ )
16 | DAVID R. HAGEN, Chapter 7 Trustee, ) Adv. No. 07-1186
)
17 | Plaintiff, ) **COUNTERCLAIMS AND CROSS-**
) **CLAIMS OF DEFENDANTS**
18 | vs. ) **NORTHRIDGE MEDICAL GROUP, INC.**
) **AND FAMILY/SENIORS MEDICAL**
19 | NAUTIC PARTNERS, LLC, , etc., et al., ) **GROUP, INC.**
)
20 | Defendants. ) Status Conference:    October 24, 2007
) Time:              1:30 p.m.
21 | ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ ) Courtroom No.: 303
CAPTION CONTINUED ON NEXT PAGE )          21041 Burbank Boulevard
22 | )          Woodland Hills, CA 91637
)
23 | ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ [Hon. Geraldine Mund]

24 | ///

25

26

27 | 1

28

ORIGINAL

1  NORTHRIDGE MEDICAL GROUP, INC., a )
   California professional medical corporation, )
2  and FAMILY/SENIORS MEDICAL )
   GROUP, INC., a California professional )
3  medical corporation, )
                                              )
4      Counterclaimants and Cross-Claimants, )
                                              )
5      vs. )
                                              )
6  MERIDIAN HEALTH CARE )
   MANAGEMENT, INC., Chapter 7 Debtor; )
7  NAUTIC PARTNERS, LLC;, a Delaware )
   limited liability company; CHISHOLM )
8  PARTNERS IV, LP, a Delaware limited )
   partnership; FLEET VENTURE )
9  RESOURCES, INC., a Delaware corporation; )
   FLEET EQUITY PARTNERS VI, LP, a )
10 Delaware limited liability company; )
   KENNEDY PLAZA PARTNERS II, LLC; a )
11 Delaware limited liability company; SCOTT )
   HILINSKI, an individual; BRIAN SATO, an )
12 individual; and MICHAEL ALPER, an )
   individual, )
13                                            )
       Counterdefendant and Cross-Defendants )
14
15
16        Defendants, counterclaimants and cross-claimants Northridge Medical Group, Group, Inc.

17  ("Northridge") and Family/seniors Medical Group, Inc., a California professional medical

18  corporation ("Family/Seniors," and collectively with Northridge, the "Medical Group Parties"),

19  for counterclaims against Meridian Health Care Management, Inc.(the "Debtor") and cross-

20  claims against  Nautic Partners, LLC, a Delaware limited liability company ("Nautic"); Chisholm

21  Partners IV, LP, a Delaware limited partnership ("Chisholm") Fleet Venture Resources, Inc., a

22  Delaware corporation ("Fleet Venture"), Fleet Equity Partners VI, LP, a Delaware limited

23  liability company ("Fleet Equity"), Kennedy Plaza Partners II, LLC; a Delaware limited liability

24  company("Kennedy"), Scott Hilinski, an individual ("Hilinski," and with Nautic, Chisholm, Fleet

25  Venture, Fleet Equity and Kennedy, collectively the "Nautic Parties"), Brian Sato, an individual

26  ("Sato") and Michael Alper, an individual ("Alper," and with the Sato and the Nautic Parties

27                                            2

28

1  collectively the "Cross-Defendants"), and each of them, allege as follows:

2  **GENERAL ALLEGATIONS**

3      1.      Northridge was at times relevant hereto, and is, a California professional medical

4  corporation with its principal place of business in Northridge, County of Los Angeles, California,

5  operating as an independent practice association in the providing of medical services.  Northridge

6  provides medical services to its managed care patients primarily in the central San Fernando

7  Valley area of Los Angeles County and surrounding areas, ranging from children and their

8  families to seniors on Medicare, through a network of several hundred physicians and other

9  health care providers who contract with Northridge to provide such services.

10      2.      Family/Seniors at all relevant times herein was a California professional medical

11  corporation with its corporate headquarters in Woodland Hills, County of Los Angeles,

12  California, operating as an independent practice association providing medical services.

13  Family/Seniors provides medical services to its managed care patients primarily in the Inland

14  Empire area of Riverside County and surrounding areas, through a network of physicians and

15  other health care providers who contract with Family/Seniors to provide such services.

16      3.      The Debtor at all relevant times was a Delaware was at all times relevant hereto,

17  and is, a Delaware corporation with its offices and principal place of business in Woodland Hills,

18  County of Los Angeles, California, engaged in the business of providing operations, management

19  and administrative services for independent practice associations such as the Medical Group

20  Parties.  Prior to July, 1999 the Debtor's predecessor in interest Meridian Health Care

21  Management, LP ("Meridian LP") was a Delaware limited partnership with its offices and

22  principal place of business in the County of Los Angeles, State of California, engaged in the

23  business of providing operations, management and administrative services for independent

24  practice associations such as the Medical Group Parties.

25      4.      Nautic was at all times relevant hereto, and is, a Delaware limited liability

26  corporation with its principal place of business in Providence, Rhode Island, specializing in the

27  3

28

1  formation and structuring of, investment in, and participation in and management of, among

2  others, companies engaged in the providing of healthcare administration and management

3  services in California and other locations in the United States, and the successor in interest of

4  Fleet Equity Partners.

5        5.      Chisholm and Fleet Equity each was at all times relevant hereto, and is, a

6  Delaware limited partnership; Fleet Venture was at all times relevant hereto, and is, a Delaware

7  corporation; and Kennedy was at all times relevant hereto, and is, a Delaware limited liability

8  company. Chisholm, Fleet Equity, Fleet Venture and Kennedy have had at all times relevant

9  hereto, and have, offices and principal places of business in Providence, Rhode Island.

10       6.      Hilinski was at all times relevant hereto, and is, a Managing Director of Nautic,

11  concentrating in its healthcare operations. Although the precise nature and extent of the

12  relationships among the Nautic Parties is not yet fully known to the Medical Group Parties, all of

13  the Nautic Parties participated in and in and benefitted from, the acts, events and conduct alleged

14  herein, and Hilinski was at all times relevant hereto, and is, a principal, manager and/or agent of

15  each of the Nautic Parties with respect to the facts and events hereinbelow alleged. From and

16  after mid-1999 until approximately December of 2005, Hilinski was also a member of the Board

17  of Directors of the Debtor, appointed to represent the interests of the Nautic Parties in the

18  exercise by the Nautic Parties of control of the Board of Directors of the Debtor. Hilinski in the

19  act, conduct and omissions alleged hereinbelow at all times relevant hereto was, and is, acting

20  within the course and scope of his actual, ostensible, apparent and/or implied authority as

21  Managing Director of Nautic and as director, officer, agent and/or employee of the Debtor, and

22  the Medical Group Parties are informed and believe and on that basis alleges that Hilinski at all

23  relevant times acted within the course and scope of his actual, ostensible, apparent and/or implied

24  authority as a director, officer, agent and/or employee of the other Nautic Parties and each of

25  them, and with their permission, acquiescence and consent.

26       7.      Alper was at all times relevant hereto the President and Chief Executive Officer of

27                                                    4

28

1    the Debtor, as well as a member of the Debtor's Board of Directors, and a resident of the County

2    of Los Angeles, State of California.  Alper in the acts, conduct and events alleged hereinbelow at

3    all relevant times acted within the course and scope of his actual, ostensible, apparent and/or

4    implied authority as a director, officer, agent and/or employee of the Debtor and with its

5    permission, acquiescence and consent, and within the course and scope of his actual and apparent

6    authority and agency conferred on him by Hilinski and the Nautic Parties.

7         8.    Sato was at all times relevant hereto the Chief Financial Officer of the Debtor, as

8    well as a member of the Debtor's Board of Directors, and a resident of the County of Los

9    Angeles, State of California.  Sato in the acts, conduct and events alleged hereinbelow at all

10   relevant times acted within the course and scope of his actual, ostensible, apparent and/or implied

11   authority as a director, officer, agent and/or employee of the Debtor and with its permission,

12   acquiescence and consent, and within the course and scope of his actual and apparent authority

13   and agency conferred on him by Hilinski and the Nautic Parties.

14        9.    In or about July, 1999, the Nautic Parties and Meridian LP, together with Alper

15   and Sato, among others, entered into a plan and scheme for the Debtor to be formed to assume

16   the business operations and assets of Meridian LP and for the Nautic Parties concurrently to

17   become primary investors in, and to participate in the management, control and operation of, the

18   Debtor.  Pursuant to this agreement and plan, on or about July 24, 1999 the Debtor was

19   incorporated and on or about July 26, 1999, and the Debtor and the Nautic Parties entered into

20   certain agreements under which the Nautic Parties acquired all of the issued and outstanding

21   preferred stock of The Debtor as well as subordinated debt issued to them by the Debtor in the

22   principal amount of $3,750,000.

23        10.   In or about August of 1999, in the County of Los Angeles, State of California, The

24   Debtor agreed with Northridge for the Debtor to provide management, administrative and related

25   services to Northridge, as set forth in the Management Services Agreement dated as of July 1,

26   1999 between Northridge and Meridian LP and Amendment 001 to Management Services

27                                    5

28

Agreement dated as of September 1, 1999 between The Debtor and Northridge (a true and copy of which, with its subsequent amendments, is attached as Exhibit "1" hereto and incorporated by reference, as the "Northridge MSA"). Pursuant to the Northridge MSA the Debtor, and through the Debtor the Nautic Parties, among other things obtained exercised operational control over certain bank accounts, revenues and funds of Northridge, and were and are obligated to account fairly and accurately for their stewardship and handling of Northridge funds.

11.    In or about November 2000, in the County of Los Angeles, State of California, the Debtor entered into an agreement with Family/Seniors whereby the Debtor agreed to provide management, administrative and related services to Family/Seniors, as set forth in the Development and Management Agreement dated as of November 1, 2000 between Family/Seniors and the Debtor (a true and correct copy of which is attached as Exhibit "2" hereto and incorporated by reference, as the "Family/Seniors MSA," and with the Northridge MSA, collectively the "Agreements"). Pursuant to the Family/Seniors MSA, the Debtor, and through the Debtor the Nautic Parties, among other things obtained and exercised operational control over certain bank accounts, revenues and funds of Family/Seniors, and were obligated to account fairly and accurately for their stewardship and handling of Family/Seniors's funds.

12.    Beginning in mid-2003, the Debtor began experiencing financial difficulty, and during the period June-September, 2003 lost significant customer accounts resulting in substantial financial losses and negative cashflows. Hilinski (who was Chairman of the Audit and Compensation Committees of the Debtor's Board of Directors), Alper and Sato were aware of and discussed these events. In particular and without limitation, Alper and Sato had a conference call regarding the Debtor's financial position and cashflow shortages in October, 2003 in which, among other things, the following occurred:

(a)    Alper requested that the Nautic Parties provide additional cash of several million dollars to The Debtor, which Hilinski immediately refused; and

(b)    Hilinski, Alper and Sato accordingly discussed alternative ways of meeting

1  The Debtor's cash needs, and agreed and adopted a plan and scheme to take funds from

2  customer accounts, including the accounts of the Medical Group Parties, over which the

3  Debtor, and through the Debtor the Nautic Parties, had control but to which they had no

4  right or ownership and to which they were not entitled, to provide cash for the benefit of

5  the Debtor and the Nautic Parties.

6      13.    Pursuant to this agreement and scheme, from approximately October of 2003 until

7  discovery of their scheme in or about December, 2005, the Debtor, Alper, Sato and the Nautic

8  Parties pursued the scheme of misappropriating and converting funds of the Debtor's clients

9  (including particularly and without limitation funds of the Medical Group Parties), to which they

10  had no right or ownership and to which they were not entitled, for their benefit and use to meet

11  ongoing expenses and obligations of the Debtor which the Nautic Parties refused to fund.

12  Among other things, Cross-Defendants, directly and through Sato, Alper and Hilinski as their

13  representatives and agents, did the following:

14      (a)    Knowingly misappropriated approximately $6,250,000 in Northridge's

15  funds and approximately $880,000 in Family/Seniors' funds, entrusted to and under the

16  control of The Debtor, as well as sums which the Medical Group Parties are informed and

17  believe and on that basis allege total additional millions of dollars in funds of other

18  accounts controlled by the Debtor. The Northridge and Family/Seniors funds thus

19  misappropriated amount to several hundred thousand dollars per month throughout 2004

20  and part of 2005;

21      (b)    Falsely represented the financial condition, business operations and

22  liabilities of the Debtor, among other means by causing improper and false adjusting

23  entries to be made to the accounts and records of the Debtor, concealing the actual

24  balances in the customer fund accounts of Northridge and Family/Seniors, among others,

25  to hide the misappropriations of customer funds; and

26      (c)    Interrupted and discontinued the annual audits of the Debtor for the year

27

28

1    ending December 31, 2003 and thereafter, and failed to put in place adequate or prudent
2    financial controls for the Debtor.

3    The acts and conduct of Cross-Defendants were intended to, and did, conceal their wrongful
4    conduct and among other things induced Northridge and Family/Seniors to continue  to trust and
5    rely upon the apparent financial and operational stability of the Debtor, which had received clean
6    or unqualified opinions on its financial statements from its outside auditors Deloitte & Touch
7    LLP for the years ending December 31, 2001 and 2002.  Alper, Sato and Hilinski and other
8    members of the Debtor's Board of Directors knew that the Debtor's financials statements were
9    false, or acted with reckless indifference to their truth or falsity.

10    14.    During this same period, from approximately October of 2003 until discovery of
11    their scheme in or about December, 2005, the Cross-Defendants made and caused and permitted
12    to be made affirmative misrepresentations to Northridge and Family/Seniors to conceal the
13    financial difficulties of the Debtor and persuade Northridge and Family/Seniors that the Debtor
14    continued to be a stable and financially sound business operation in which Northridge and
15    Family/Seniors could continue to repose trust and confidence.  These misrepresentations
16    included, in particular and without limitation, the use of Nautic's public statements and
17    representations about its financial strength and expertise, when the Nautic Parties had already
18    refused to provide additional funding to the Debtor.  These representations were made, among
19    other times, at or about the time that the Cross-Defendants recognized and acknowledged among
20    themselves, that the redemption by the Debtor of the preferred stock held by the Nautic Parties
21    and repayment to the Nautic Parties of the Notes, which were to have taken place respectively in
22    March and July of 2004, could not be implemented because of the actual financial condition of
23    the Debtor which they concealed and misrepresented, as above alleged.

24    15.    During this same period, , from approximately October of 2003 until discovery of
25    their scheme in or about December, 2005, in furtherance of the interests of the Nautic Parties as
26    well as Alper, Sato and the Debtor, Cross-Defendants beginning in early 2004 undertook efforts

27

28

1  to arrange for a sale of the positions of the Nautic Parties in the Debtor to prospective third

2  parties, among other things so the Nautic Parties could recoup their investments in the Debtor.

3  These efforts, which culminated in a purchase and sale transaction with e4e, Incorporated in or

4  about August 2005, were furthered by, and made possible only by, the continued

5  misappropriations by and on behalf of the Debtor and Cross-Defendants of customer funds, in

6  particular the millions of dollars of the funds of Northridge and Family/Seniors, which enabled

7  the Debtor and Cross-Defendants to continue to present the Debtor as a viable business and

8  attractive acquisition.

9       16.    Further, the acts and conducts of the Debtor and Cross-Defendants as set forth

10  above, by concealing the true condition of the Debtor's business as well as the wrongful

11  misappropriations of the funds of Northridge and Family/Seniors, prevented Northridge from

12  obtaining the benefits of the Northridge MSA and from exercising its rights and remedies under

13  the Northridge MSA, and prevented Family/Seniors from obtaining the benefits of the

14  Family/Seniors MSA and from exercising its rights and remedies under the Family/Seniors MSA.

15  Northridge and Family/Seniors, and each of them, have performed all duties and obligations on

16  their parts to be performed herein, except as performance thereof has been excused by the acts,

17  conduct and/or omissions of the Debtor and Cross-Defendants.

18       17.    Northridge and Family/Seniors, and each of them, as a proximate result of the acts

19  and conduct of the Debtor and Cross-Defendants as alleged above, has sustained losses of their

20  property in sums not yet fully ascertained but in excess of $6,250,000 for Northridge and

21  $880,000 for Family/Seniors. Further, by reason of such losses the Medical Group Parties have

22  sustained the loss and loss of use of valuable health care resources impacting them and their

23  patient communities, and unless and until such sums and property are returned to them, their

24  capacity to apply same toward health care services and quality of care improvement programs for

25  the benefit of their patient communities will continue to be impaired thereby.

26  ///

27                                9

28

## **FIRST CLAIM FOR RELIEF**

[Intentional Misrepresentation, Against the Debtor and Cross-Defendants]

18.    The Medical Group Parties reallege and incorporate by this reference all the allegations of Paragraphs 1 though 17, inclusive, hereinabove, as though set forth here at length.

19.    The acts and conduct of the Debtor and Cross-Defendants as hereinabove alleged were done falsely, fraudulently and in order to induce the Medical Group Parties to act in reliance upon the apparent performance, stability and financial strength of the Debtor and support and financial strength of the Nautic Parties, to enable the Debtor and Cross-Defendants wrongfully to misappropriate and use to their benefit the Medical Group Parties' funds.

20.    The Medical Group Parties were ignorant of the falsity of the representations of the Debtor and Cross-Defendants and believed them to be true. In reliance on these representations, The Medical Group Parties were induced to and did refrain from terminating the Northridge MSA and Family/Seniors MSA, respectively, taking any action to prevent the Debtor and Cross-Defendants from accessing the Medical Group Parties's funds, or otherwise protecting their rights under the Agreements.    The Medical Group Parties's reliance upon the representations, acts and conduct of Defendants was reasonable and justifiable, in that the Debtor at all relevant times appeared to be stable and properly performing its obligations and to have the support of the Nautic Parties and their financial resources.

21.    As a proximate result of the fraudulent conduct of the Debtor and Cross-Defendants as hereinabove alleged, the Medical Group Parties have been damaged in sums not yet fully ascertained but which exceed $6,250,000 for Northridge and $880,000 for Family/Seniors.

22.    The fraudulent representations, concealments, acts and conduct of the Debtor and the Cross-Defendants as set forth above were made and performed with respect to material facts and with the intention on their part of thereby depriving the Medical Group Parties of legal rights and otherwise causing injury, and thus constituted despicable conduct that subjected The Medical

1    Group Parties to unjust hardship in conscious disregard of the Medical Group Parties's rights,

2    and were done with malice, fraud and oppression, and each of the Medical Group Parties is

3    accordingly entitled to punitive damages in a sum or sums in excess of $10,000,000.00.

4                            **SECOND CLAIM FOR RELIEF**

5              [Fraud-Suppression of Fact, Against the Debtor and Cross-Defendants]

6         23.      The Medical Group Parties reallege and incorporate by this reference all the

7    allegations of Paragraphs 1 though 17 and 19 through 22, inclusive, hereinabove, as though set

8    forth here at length.

9         24.      In representing the apparent performance, stability and financial strength of the

10   Debtor, and the support and financial strength of the Nautic Defendants as herein alleged, the

11   Debtor and Cross-Defendants failed to reveal and suppressed material facts concerning the

12   Debtor's loss of business and inability to meet its financial obligations and the refusal of the

13   Nautic Parties to provide necessary financial support for the Debtor, which facts were known to

14   the Debtor and Cross-Defendants at all times herein mentioned. The suppression of these facts

15   was likely to mislead the Medical Group Parties and in fact did mislead the Medical Group

16   Parties

17        25.      The Medical Group Parties, at the time these failures to disclose and suppressions

18   of facts occurred, and at the time the Medical Group Parties took and refrained from taking the

19   actions herein alleged, were ignorant of the existence of the facts that the Debtor and Cross-

20   Defendants suppressed and failed to disclose.  If the Medical Group Parties had been aware of

21   the facts not disclosed and concealed by the Debtor and Cross-Defendants, the Medical Group

22   Parties would have, among other actions, terminated the Agreements and taken action to prevent

23   the Debtor and Cross-Defendants from accessing the Medical Group Parties' funds, or would

24   otherwise have protected their rights under the Agreements.   The Medical Group Parties's

25   reliance upon the representations, acts and conduct of Defendants was reasonable and justifiable,

26   in that the Debtor at all relevant times appeared to be stable and properly performing its

27                                          11

28

1    obligations and to have the support of the Nautic Parties and their financial resources.

2    **THIRD CLAIM FOR RELIEF**

3    [Negligent Misrepresentation, Against the Debtor and Cross-Defendants]

4    26.    The Medical Group Parties reallege and incorporate by this reference all the

5    allegations of Paragraphs 1 though 17, 19 through 22, 24 and 25, inclusive, hereinabove, as

6    though set forth here at length.

7    27.    The representations, concealments, and acts of the Debtor and Cross-Defendants

8    as set forth hereinabove were made and done without reasonable basis for the truth or accuracy of

9    such representations and with knowledge that the Debtor and Cross-Defendants lacked a

10    reasonable basis therefor.

11    **FOURTH CLAIM FOR RELIEF**

12    [Conspiracy to Commit Fraud, Against All Cross-Defendants]

13    28.    The Medical Group Parties reallege and incorporate by this reference all the

14    allegations of Paragraphs 1 though 17, 19 through 22, 24, 25 and 27, inclusive, hereinabove, as

15    though set forth here at length.

16    29.    Beginning in or about October, 2003, the Cross-Defendants knowingly and

17    willfully conspired and agreed among themselves to misappropriate funds of The Debtor

18    customers, including without limitation The Medical Group Parties, and to conceal from The

19    Medical Group Parties, among others, that such Cross-Defendants had caused to be

20    misappropriated and stolen money from customer accounts and falsely to present The Debtor,

21    with the support and financial strength of Nautic, as a financially stable business.

22    30.    The Debtor and the Cross-Defendants did the acts and things herein alleged

23    pursuant to, and in furtherance of, said conspiracy.

24    31.    Among other overt acts in furtherance of the above-described conspiracy, in or

25    after August, 2005 the Nautic Parties, among other things, obtained more than $3,750,000 in

26    cash from the sale of their investments in The Debtor; the Debtor and the Cross-Defendants

27                                                    12

28

1  falsely represented the financial condition, business operations and liabilities of the Debtor and

2  the apparent support of the Debtor by the Nautic Parties and the financial resources of the Nautic

3  Parties, and concealed the true financial condition of the Debtor and the refusal of the Nautic

4  Parties to provide necessary financial support for the Debtor, by the means hereinabove alleged;

5  the Debtor and the Cross-Defendants repeatedly removed funds from the Medical Group Parties'

6  accounts to which they were not entitled and in which they had no ownership or right; and the

7  Debtor and the Cross-Defendants interrupted and discontinued the annual audits of the Debtor

8  for the year ending December 31, 2003 and thereafter.

9      32.    In addition, the Debtor and the Cross-Defendants ratified and adopted each act

10  performed in furtherance of the above-described conspiracy.

11     33.    The Medical Group Parties are informed and believes and thereon alleges that the

12  last overt acts in pursuance of the above-described conspiracy occurred in or about January 2006,

13  when the Cross-Defendants caused funds wrongfully to be removed and misapplied from the

14  accounts of the Medical Group Parties.

15     34.    The Medical Group Parties did not become aware of the frauds perpetrated upon

16  them until in or about December, 2005, and did not become aware of the above-described

17  conspiracy until in or about January, 2006.

18                          **FIFTH CLAIM FOR RELIEF**

19                      [Conversion, against All Cross-Defendants]

20     35.    The Medical Group Parties reallege and incorporate by this reference all the

21  allegations of Paragraphs 1 though 17, 19 through 22, 24, 25, 27 and 29 through 34, inclusive,

22  hereinabove, as though set forth here at length.

23     36.    The Debtor and Cross-Defendants, by reason of the acts and conduct as alleged

24  hereinabove, have exercised wrongful dominion and control over property of the Medical Group

25  Parties, namely, their respective funds as above alleged, and unlawfully taken, appropriated and

26  converted property of the Medical Group Parties to their own use and benefit.

27                                    13

28

## SIXTH CLAIM FOR RELIEF

[Breach of Contract, Against The Debtor]

37.   The Medical Group Parties reallege and incorporate by this reference all the allegations of Paragraphs 1 though 17, 19 through 22, 24, 25, 27, 29 through 34 and 36, inclusive, hereinabove, as though set forth here at length.

38.   Northridge and Family/Seniors, and each of them, have performed all duties and obligations on their parts to be performed under each of their respective Agreements, except as performance thereof has been excused by the acts, conduct and/or omissions of the Debtor and Cross-Defendants.

39.   As a proximate result of the breach and defaults by the Debtor under the Agreements as hereinabove alleged,  the Medical Group Parties have been damaged in sums not yet fully ascertained but which exceed $6,250,000 for Northridge and $880,000 for Family/Seniors.

## SEVENTH CLAIM FOR RELIEF

[Intentional Interference with Contractual Relationship, Against the Nautic Parties]

40.   The Medical Group Parties reallege and incorporate by this reference all the allegations of Paragraphs 1 though 17, 19 through 22, 24, 25, 27, 29 through 34, 36, 38 and 39, inclusive, hereinabove, as though set forth here at length.

41.   The acts and conduct of the Nautic Parties as set forth above were intended to, and were, done with the intent and result of inducing the Debtor to breach its obligations to Northridge under the Northridge MSA, and to Family/Seniors under the Family/Seniors MSA, by among other things misappropriating the funds of Northridge and Family/Seniors, respectively, and otherwise as hereinabove alleged.

## EIGHTH CLAIM FOR RELIEF

[Declaratory Relief, Against the Debtor and all Cross-Defendants]

42.   The Medical Group Parties reallege and incorporate by this reference all the

14

1    allegations of Paragraphs 1 though 17, 19 through 22, 24, 25, 27, 29 through 34, 36, 38, 39 and

2    41, inclusive, hereinabove, as though set forth here at length.

3        43.    By reason of the foregoing, there is an actual controversy by and between the

4    Medical Group Parties on the one hand, and the Debtor and Cross-Defendants on the other hand,

5    in that, among other things The Medical Group Parties maintain that they are entitled to the

6    possession, use, recovery and benefit of their funds and assets, whereas Cross-Defendants have

7    misappropriated and converted same and denied the Medical Group Parties the use thereof; and

8    the Medical Group Parties are informed and believes and on that basis alleges that the Debtor and

9    Cross-Defendants continue to claim that they are entitled to do so and are not liable to the

10    Medical Group Parties thereby.

11        45.    A decree and judgment of this Court is necessary and appropriate to adjudicate the

12    respective rights and obligations as between the Medical Group Parties, the Debtor and Cross-

13    Defendants in the premises.

14        WHEREFORE, the Medical Group Parties pray for judgment against the Debtor and

15    Cross-Defendants, and each of them, as follows:

16        ON THE FIRST THROUGH FIFTH CLAIMS FOR RELIEF: As against the Debtor and

17    all Cross-Defendants, for compensatory damages according to proof but not less than $6,250,000

18    for Northridge and $880,000 for Family/Seniors, and for punitive and exemplary damages in

19    favor of each of the Medical Group Parties as determined upon trial of this action but not less

20    than $10,000,000;

21        ON THE SIXTH CLAIM FOR RELIEF: As against the Debtor, for compensatory

22    damages according to proof but not less than $6,250,000 for Northridge and $880,000 for

23    Family/Seniors;

24        ON THE SEVENTH CLAIM FOR RELIEF: As against the Nautic Parties, for

25    compensatory damages according to proof but not less than $6,250,000 for Northridge and

26    $880,000 for Family/Seniors, and for punitive and exemplary damages in favor of each of the

27        15

28

1  Medical Group Parties as determined upon trial of this action but not less than $10,000,000;

2      <u>ON THE EIGHTH CLAIM FOR RELIEF</u>: As against the Debtor and all Cross-

3  Defendants, for the decree and judgment of this Court adjudicating the rights and obligations of

4  the Medical Group Parties, the Debtor and Cross-Defendants in the premises;

5      <u>ON ALL CLAIMS FOR RELIEF</u>:  For prejudgment and postjudgment interest as

6  provided by law, for the Medical Group Parties's attorneys' fees and expenses to the extent

7  provided by law, for costs of suit incurred herein, and for such other and further relief as the

8  Court may deem just and proper.

9

10  Dated: September 21, 2007          UZZELL S. BRANSON III
                            A Professional Corporation

11                              LAW OFFICES OF UZZELL S. BRANSON III

12                              By: _____

13                                    Uzzell S. Branson III
                            Attorney for Defendants, Counterclaimants and Cross-

14                              Claimants Northridge Medical Group, Inc. and
                            Family/Seniors Medical Group, Inc.

15

16  Dated: September 21, 2007          CHRISTENSEN & AUER

17

18                              By: _____
                                 Stephen G. Auer

19                           Attorneys for Defendant, Counterclaimant and Cross-
                            Claimant Family/Seniors Medical Group, Inc.

20  ///

21

22

23

24

25

26

27                             16

28

# MANAGEMENT SERVICES AGREEMENT

between

**MERIDIAN HEALTH CARE MANAGEMENT**

and
**Northridge Medical Group, Inc.**

**a California professional medical corporation**

**Dated as of July 1, 1999**

©1999; All Rights Reserved
MJD3172.MSA

1

# TABLE OF CONTENTS

Page

RECITALS ............................................................................................. 1

AGREEMENT ........................................................................................ 1

**ARTICLE I**

        RELATIONSHIP OF THE PARTIES .................................. 2
1.1   Independent Contractors ................................................. 2
1.2   Control Over Practice of Medicine ................................. 2
1.3   Representations and Warranties of the Parties ............... 2

**ARTICLE II**

        RESPONSIBILITIES OF MHCM ....................................... 3
2.1   Engagement ..................................................................... 3
2.2   Authority of MHCM ....................................................... 3
2.3   Managed Care Contract Negotiations ............................ 3
2.4   Provider Agreements ...................................................... 3
2.5   Utilization and Quality Management .............................. 4
2.6   Claims Administration .................................................... 4
2.7   Billing and Collections ................................................... 5
2.8   General Financial Management ...................................... 5
2.9   Marketing Assistance ...................................................... 5
2.10   Custody of Records ......................................................... 5
2.11   Support Services .............................................................. 5
2.12   Support Personnel ........................................................... 6
2.13   IPA Expenses .................................................................. 6
2.14   Performance Guarantees ................................................. 6
2.15   Non-Exclusivity .............................................................. 6

**ARTICLE III**

        OBLIGATIONS OF IPA ..................................................... 7
3.1   Organization and Licensure. .......................................... 7
3.2   Medical Services ............................................................. 7
3.3   Practice of Medicine ....................................................... 7
3.4   Standards of Practice and Conduct ................................ 7
3.5   Terms of Provider Agreements ...................................... 8
3.6   Documentation of Services Performed ........................... 8
3.7   Insurance ......................................................................... 8
3.8   IPA Expenses .................................................................. 8

©1999; All Rights Reserved
MID3172.MSA

2

ARTICLE VIII

MISCELLANEOUS ............................................. 15
8.1    Taxes and Tax Returns .......................................... 15
8.2    Books and Records ............................................. 15
8.3    Assignment .................................................... 15
8.4    Successor in Interest .......................................... 15
8.5    Modification of Agreement ...................................... 15
8.6    Modification Compelled by Law .................................. 16
8.7    Waiver; Consents .............................................. 16
8.8    Force Majeure ................................................. 16
8.9    Remedies ...................................................... 16
8.10   No Requirement to Refer ....................................... 17
8.11   Headings ...................................................... 17
8.12   Notices ....................................................... 17
8.13   Non-discrimination ............................................ 18
8.14   Counterparts .................................................. 18
8.15   No Third Party Beneficiary .................................... 18
8.16   Governing Law ................................................. 18
8.17   Language Construction ......................................... 18
8.18   Dispute Resolution ............................................ 18
8.19   Attorneys' Fees ............................................... 19
8.20   Time is of the Essence ........................................ 19

## EXHIBIT LIST

EXHIBIT "A"        Compensation
EXHIBIT "B"        Operational Management Services
EXHIBIT "C"        Performance

©1999; All Rights Reserved
MJD3172.MSA

3.9    Assistance ............................................................................ 8
3.10   Corporate Status ................................................................. 9
3.11   Board of Directors Meetings ............................................ 9
3.12   Cooperation and Authority ................................................ 9

ARTICLE IV

FINANCIAL ARRANGEMENTS ................................... 9
4.1    Gross Revenue Defined ...................................................... 9
4.2    Deposit of Gross Revenue ................................................ 10
4.3    Management Fee .................................................................. 10
4.4    Credentialing Fee ................................................................ 10
4.5    Fee Payment ........................................................................ 10
4.6    Fair Value Warranty ........................................................... 10

ARTICLE V

TERM AND TERMINATION ........................................ 10
5.1    Term and Termination Without Cause .............................. 10
5.2    Termination With Cause or Cancellation ......................... 11
5.3    Actions After Termination ................................................. 11

ARTICLE VI

INDEMNIFICATION ....................................................... 12
6.1    Indemnification by IPA ...................................................... 12
6.2    Indemnification by MHCM ................................................ 12
6.3    Survival of Obligations ...................................................... 12

ARTICLE VII

RESTRICTIVE COVENANTS ........................................ 13
7.1    Exclusivity ........................................................................... 13
7.2    Non-Solicitation .................................................................. 13
7.3    Non-Disclosure .................................................................... 13
7.4    Confidentiality of Agreement ............................................ 13
7.5    Reasonableness of Restrictions ......................................... 14
7.6    Severability .......................................................................... 14
7.7    Remedies .............................................................................. 14

©1999; All Rights Reserved
MID3172.MSA

## MANAGEMENT SERVICES AGREEMENT

This Management Services Agreement (*"Agreement"*) is made and entered into as of the ___ day of _____, 1999 (the *"Effective Date"*), by and between Meridian Health Care Management, LP, a Delaware Limited Partnership, ("*MHCM*"), and Northridge Medical Group, a wholly owned subsidiary of Southern California Regional Medical Group, Inc. a California professional medical corporation (*"IPA"*), for the provision of management services by MHCM to IPA. IPA and MHCM are sometimes referred to herein individually as a *"Party"* or collectively as the *"Parties."*

### RECITALS

A.      IPA is a duly formed and validly existing California professional medical corporation, which has been organized in Los Angeles, California, to operate as an independent practice association, and to enter into agreements with organizations such as health care service plans and other purchasers of pre-paid medical services (hereinafter collectively referred to as *"Plans"*) for the arrangement of the provision of health care services to subscribers or enrollees of said Plans (the *"Business"*);

B.      IPA has entered or is entering into written agreements with physicians and other health care professionals (*"Providers"*) to provide or arrange for the provision of health care services to subscribers or enrollees of Plans (*"Enrollees"*) that have or will contract with IPA for health care services;

C.      In addition to providing or arranging for the provision of health care services to subscribers or enrollees of Plans, IPA is expecting to perform a variety of administrative and management services in connection with the provision of health care services to Enrollees of Plans;

D.      MHCM is in the business of providing management and administrative services and has developed operations, management and marketing systems for independent practice associations engaged in providing health care services to Plans;

E.      IPA desires to engage MHCM, and MHCM is willing to provide IPA with the necessary support to manage the Business, all upon the covenants, conditions and restrictions set forth in this Agreement.

©1999; All Rights Reserved
MHCM MSA 7.99

1

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants, conditions and restrictions set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I
## RELATIONSHIP OF THE PARTIES

**I.1    Independent Contractors**. In performing their obligations hereunder, the Parties shall be and shall act as independent contractors. MHCM is not a partner, joint venturer, or employee of IPA. Except as otherwise expressly set forth in this Agreement, neither Party will have the authority to bind the other Party, contractually or otherwise. In addition, IPA will not have any claim under this Agreement, or otherwise, against MHCM for vacation pay, sick leave, unemployment insurance, worker's compensation, disability benefits or employee benefits of any kind.

**I.2    Control Over Practice of Medicine**. The Parties acknowledge and agree that the physicians who are engaged by IPA (each, a *"Physician"*, and, collectively, the *"Physicians"*), shall have exclusive control over the practice of medicine and the delivery of professional medical services to Enrollees, and that all diagnoses, tests, and other professional medical and clinical services shall be undertaken or directly supervised by Physicians and other duly licensed non-physician health care professionals who are engaged by IPA.

**I.3    Representations and Warranties of the Parties**. Each Party represents and warrants as follows: (i) this Agreement when executed and delivered will constitute the Party's legal, valid and binding obligation enforceable in accordance with its terms, subject to general equitable principles and the laws governing creditors' rights; (ii) the Party has full legal power and authority to enter into and deliver this Agreement and perform the transactions contemplated herein; (iii) all consents, approvals, resolutions, authorizations, actions or orders required of the Party for the authorization, execution and delivery of, and for the consummation of the transactions contemplated by, this Agreement have been obtained; (iv) the execution and delivery of this Agreement, and the performance of its obligations hereunder, do not conflict with or violate any judicial or administrative order, award, judgment or decree applicable to the Party, or violate or conflict with any of the terms, conditions or provisions of the Party's organizational documents or any contract between the Party and any third person or entity.

©1999; All Rights Reserved
MHCM MSA 7.99

2

## ARTICLE II
## RESPONSIBILITIES OF MHCM

**II.1    Engagement.** IPA hereby engages MHCM and MHCM hereby agrees to serve as the sole and exclusive administrator of the Business for those items identified in Exhibit B, commencing as of the Effective Date and subject to the terms and conditions of this Agreement.

**II.2    Authority of MHCM.** Consistent with the provisions of this Agreement, MHCM shall be responsible for providing such management services as are reasonably necessary, advisable, or proper to conduct the business affairs of the Business.   In carrying out its obligations under this Agreement with respect to the management of the Business, MHCM agrees to provide the services set forth in Exhibit B.   (Exhibit B is attached hereto and hereby incorporated by this reference herein.)  MHCM agrees that it will not, without the prior written consent of IPA, which consent IPA may give or withhold in its sole and complete discretion, do any of the following:  (i) sell, mortgage, pledge, convey, assign, hypothecate, or otherwise transfer any interest in any property of IPA; or (ii) incur debts or enter into contracts, leases, or other agreements in IPA's name except as such obligations are expressly approved in the IPA's annual operating or capital budget or this Agreement.   In the performance of its services hereunder, MHCM shall act at all times in good faith and within reasonable diligence, MHCM shall perform all duties and obligations under this Agreement in a timely manner.  MHCM shall devote the required employees' time as is necessary for MHCM to perform its duties and obligations under this Agreement.

**II.3    Managed Care Contract Negotiation and Implementation.**    IPA shall be responsible for negotiating managed care payor contracts ("Managed Care Contracts").  MHCM shall have the opportunity, prior to execution of any such contract, to review and comment with respect to administrative issues and implementation issues.  IPA shall provide MHCM with copies of each Managed Care Contract.

          (a)    IPA and MHCM shall comply with all terms of each Managed Care Contract including, without limitation, the terms of all documents or instruments incorporated therein by reference and all documents or instruments related thereto.

          (b)    MHCM agrees to provide all management services within its scope of responsibility necessary to implement such Managed Care Contracts or amendments to such Managed Care Contract.

**II.4    Provider Agreements.** MHCM agrees to assist IPA in the administration of its agreements with Physicians and other providers of health care services ("*Providers*"), including, without limitation, (i) soliciting and negotiation with Providers identified by the IPA as necessary for IPA operations; (ii) assisting in the credentialing of such Providers by providing the Provider's credentialing application and related information to the IPA designated contracted credentialing company or the Plan, as appropriate; (iii) making recommendations regarding the

©1999; All Rights Reserved
MHCM MSA 7.99

3

)

business terms of agreements between IPA and such Providers; (iv) instructing Providers and their office staff regarding established IPA policies and procedures. IPA shall provide MHCM with provider contracting guidelines which shall specify reimbursement rate ranges, reimbursement methodologies and scope of services for each specialty. Any and all Provider agreements are subject to the approval of the Board of Directors of IPA.

Both Parties recognize that the services to be provided by MHCM will be feasible only if IPA operates an active business. Therefore, IPA agrees to obtain and enforce a written Participating Provider Agreement with each current and future Physician who provides professional medical services for IPA (a *"Provider Agreement"*). Each Provider Agreement shall comply with all applicable laws, and shall comply with all provisions of this Agreement, including in particular and without limitation, all provisions of Section III.5   Except with MHCM's prior written consent, IPA agrees not to amend any Provider Agreement if such amendment would cause the Provider Agreement not to be consistent with any provision of this Agreement.  If MHCM believes that any particular Provider Agreement should be terminated or that a particular Provider should not be engaged by IPA, and IPA disagrees, then IPA will promptly meet with MHCM in a conscientious and good faith effort to reach an agreement on such question.  IPA shall be responsible for funding the payment of compensation for all Providers.  MHCM shall have no obligation whatsoever to provide funds for compensating any Provider.  MHCM shall reasonably cooperate with and assist IPA to meet its obligations in relations to its Provider Agreements, provided however, that IPA acknowledges and agrees that it shall retain ultimate responsibility for meeting such obligations.

   **II.5    Utilization and Quality Management**.  MHCM shall provide such utilization and quality management services as are reasonably necessary for the operations of the Business. These services shall include eligibility verification, case management, specialty referral review, claims review, and hospital and utilization tracking and coordination with hospital utilization management and case management staff.  All services shall be performed in accordance with written utilization management and quality management policies and procedures developed by IPA in consultation with MHCM.

   **II.6    Claims Administration**.  MHCM shall have sole and exclusive right and responsibility to administer and pay claims for services rendered to IPA by Physicians and other Providers, including, without limitation, the following:  (i) reviewing claims and supporting documentation submitted by Physicians and other Providers; (ii) calculating payable claims based on the IPA and Plan policies and procedures; (iii) billing other payors for coordination of benefits and other third party liability payments according to IPA and Plan policies and procedures; and (iv) preparing and disbursing checks to pay amounts due and owning, subject to prior approval of IPA and the defined disbursement procedures. MHCM shall perform its duties within the time frames established by the Plans, the State of California Department of Corporations and/or HCFA. Failure to perform at this level will constitute a breach of this Agreement.

©1999; All Rights Reserved
MHCM MSA 7.99

4

**II.7    Billing and Collections**.    MHCM shall have sole and exclusive right and responsibility to bill, collect, and receive payments, for medical services rendered by IPA for which IPA does not receive capitation or for services where additional reimbursement is owed to IPA.  This may include, but not be limited to stop loss cases, third party liability cases, and services for which the Plans reimburse IPA on a fee for service basis. MHCM shall use diligent, good faith efforts to bill and collect such accounts receivable in a timely manner, subject to the receipt by MHCM from IPA, Physicians and other providers, of the billing information as required.

**II.8    General Financial Management**.    MHCM shall provide such financial accounting and record keeping services as are reasonably necessary for the operations of the Business.  These services shall include financial record keeping, accounts receivable and accounts payable processing, bank reconciliation, and preparation of a monthly unaudited financial statements with respect to the operation of the Business (balance sheets and income statements generated in a format agreed upon by IPA and MHCM).  IPA shall be solely responsible for the preparation of all audited financial statements of IPA.  MHCM agrees to assist and coordinate with IPA's certified public accountants, at its sole cost and obligation, the annual review of IPA's books and records and the preparation of compiled or reviewed financial statements, provided, however, that MHCM shall have no responsibility for the preparation of IPA's federal or state income tax returns or the payment of such income taxes.

**II.9    Marketing Assistance**.  MHCM agrees to assist IPA in the development of a marketing plan and related materials for the advertising and marketing of IPA's Business and the services offered by IPA.  In furtherance of the foregoing, MHCM agrees, on behalf of IPA and at IPA's sole expense, to engage appropriate personnel to accomplish this task if such engagement is deemed necessary by IPA.  IPA hereby authorizes MHCM to use IPA's name, address and office location and the respective names, images, qualifications and biographical data of the Physicians in advertising and marketing materials developed by MHCM, or its agents, employees or subcontractors.

**II.10   Custody of Records**.  MHCM shall maintain on behalf of IPA, custody of all records and files relating to the day-to-day operation of the Business, including but not limited to, books of account and financial records, and patient medical records.  Patient medical records shall at all times be and remain the property of IPA and shall be located at the Medical Offices so that they are readily accessible for patient care.  The management of all files and records shall comply with applicable state and federal laws.  MHCM shall use its best efforts to preserve the confidentiality of patient medical records and use information contained in such records only for the limited purposes necessary to perform the services set forth herein.

**II.11   Support Services**.  MHCM agrees, at its cost and expense, to provide or arrange

©1999; All Rights Reserved
MHCM MSA 7 99

for the provision of all support services as are reasonably necessary for the provision of the services required of MHCM under this Article II (the *"Support Services"*), including but not limited to, computer services, printing, postage and duplication services.

**II.12  Support Personnel.**  MHCM agrees, at its cost and expense, to provide or arrange for the provision of all non-physician personnel as are reasonably necessary for the provision of the services required of MHCM under this Article II (the *"Support Personnel"*). Support Personnel does not include any Providers. All Support Personnel shall be subject to the supervision, direction and control of MHCM, including, without limitation, (i) hiring any Support Personnel; (ii) determining the salaries, fringe benefits, bonuses, health and disability insurance, workers' compensation insurance and any other benefits that the Support Personnel receive; and (iii) determining any appropriate disciplinary action required to be taken against Support Personnel, up to and including termination. IPA shall have the right to periodically evaluate any on-site MHCM personnel and report such evaluations to MHCM. However, the hiring, compensation and all other terms of employment for all on-site and off-site MHCM personnel shall be at the sole discretion of MHCM. MHCM agrees to assign an administrator who will be responsible for the day-to-day operations of the IPA and who will be responsive to the Board of Directors of IPA.

**II.13  IPA Expenses.**  Except as otherwise provided in this Agreement, MHCM agrees, at its sole cost and expense, to provide the services set forth in this Article II. Notwithstanding the foregoing, MHCM shall have no obligation to pay the following expenses incurred by or on behalf of IPA, which shall be the sole and complete responsibility of IPA:  (i) Physician or provider compensation; (ii) expenses for medical offices, facilities, and equipment; (iii) life, malpractice and other insurance expenses; (iv) expenses of attorneys and accountants; (v) IPA Board of Director, committee or medical directorship fees; (vi) costs incurred, with IPA's prior written consent, for IPA's membership, Board, or committee meetings, excluding costs for routine preparation of information packets, presentation materials and other routine materials; (vii) entertainment and travel expenses; (viii) fees relating to professional licensing and Drug Enforcement Administration ("DEA") certification, and other professional licensing, registration and certification requirements; (ix) dues, subscriptions and continuing education expenses; (x) contributions to charitable or other organizations; and (xi) income taxes and preparation of tax returns, (xii) credentialing and provider office site visits.

**II.14  Performance Guarantees.**  MHCM agrees to meet the specific performance standards as described in Exhibit C.

**II.15  Non-Exclusivity.**  IPA acknowledges and agrees that MHCM's obligation to provide management services to IPA as required hereunder is non-exclusive, and that MHCM has the right, without obtaining IPA's prior consent, to make similar arrangements with other physicians, medical groups or independent practice associations ("Physician Groups") to provide

©1999; All Rights Reserved
MHCM MSA 7.99

6

management and administrative services to such other physicians or medical groups.

## ARTICLE III
## OBLIGATIONS OF IPA

**III.1  Organization and Licensure.**  As a continuing condition of MHCM's obligations under this Agreement, IPA and each of its Physicians shall at all times during the term hereof be and remain legally organized and licensed to provide professional medical services in accordance with all requirements of applicable state and federal laws and regulations.

**III.2  Medical Services.**  IPA agrees to provide professional medical services to patients of the Business at all times in accordance with requirements of professional services agreements between IPA and each Plan, and in accordance with this Agreement (*"Medical Services"*).  IPA further agrees as an essential term of this Agreement to undertake to provide Medical Services in a cost-effective manner consistent with accepted utilization review and quality assurance practices prevailing in the IPA's service area.

**III.3  Practice of Medicine.**  IPA shall be solely and exclusively responsible for supervising, directing and controlling all aspects of the practice of medicine and the provision of medical care and services to Enrollees, including, without limitation, diagnosis, treatment, prescription and administration of medicine and drugs, the preparation of medical records and reports, and the training of Physicians and other Providers, and the compliance of Physicians and other Providers with the utilization management and quality management policies and procedures of IPA.  MHCM shall neither have nor exercise any control or direction over the methods by which IPA or any Physicians practice medicine.

**III.4  Standards of Practice and Conduct.**  IPA agrees that all medical services provided by IPA, and each Physician and Provider, shall be consistent with the applicable professional standards of the American Medical Association, the applicable law of the State of California, and the prevailing community standards of care in the Los Angeles area, and federal laws and regulations (including specifically those related to the Medicare and Medi-Cal programs). IPA shall take all steps necessary to ensure that it and each of its Physicians remain in good standing as a provider under the Medicare and Medi-Cal programs, as appropriate.  IPA shall take all steps necessary to ensure that Physicians remain duly licensed to practice medicine in the State of California and maintain unrestricted prescription authority from the DEA.  IPA shall take all steps necessary to ensure that all Providers are qualified and licensed to perform the services for which they are contracted pursuant to applicable law and/or professional standards. IPA shall maintain utilization management and quality management programs as established from time to time by IPA in consultation with MHCM, or as mandated by accreditation and/or licensing standards applicable to the Business, and shall ensure that each of its contracting Physicians participates in such continuing medical education as is necessary for such person to

©1999: All Rights Reserved
MHCM MSA 7.99

maintain adequate professional skills and expertise. IPA acknowledges and agrees that it is solely responsible for making all reports, if any, required to be made to the Medical Board of California under Section 805 of the California Business and Professions Code, or to the National Practitioner Data Bank.

**III.5   Terms of Provider Agreements.**  Each Provider Agreement shall require the Provider: (i) to maintain a current unrestricted licenses to practice their respective professions in the State of California; (ii) to maintain a current unrestricted certification by the Federal Drug Enforcement Administration ("DEA"); (iii) to maintain professional liability insurance covering all activities by such Provider consistent with the terms of Section 3.8 below; (iv) for Physician Providers, to maintain appropriate medical staff membership and clinical privileges at hospitals to the extent necessary for the provision of professional medical services to Enrollees of Plans; and (v) to maintain the confidentiality of IPA's information and the Confidential Information of MHCM, pursuant to terms consistent with Section VII.3 of this Agreement.  IPA agrees to establish procedures to ensure that Providers and Provider Agreements meet these requirements on an ongoing basis.  IPA further agrees to use commercially reasonable efforts to enforce the covenants made by Providers in any Provider Agreement.

**III.6   Documentation of Services Performed.**  IPA and Physicians shall be solely responsible for recording and collecting proper encounter data, including, without limitation, coding and recordation of all medical services and all other health care services provided by any of the Physicians or other IPA providers to Enrollees.  IPA agrees to furnish or cause to be furnished to MHCM, all encounter data and information required by MHCM to properly report such information to Plans or to bill and collect  for medical services provided in accordance to Section II.7.  Such information shall be submitted in a format agreed upon by the Parties.

**III.7   Insurance.**   Each party covenants and agrees that it shall obtain and maintain in effect throughout the initial term of this Agreement and each renewal term thereof, as appropriate, such policies of comprehensive general liability insurance and professional liability insurance including, but not limited to Directors & Officers and Errors & Omissions policies as well as comprehensive general liability insurance, as appropropriate.

**III.8   IPA Expenses.**  IPA shall be responsible for any and all expenses incurred by or on behalf of IPA other than those expenses for which responsibility has been expressly assumed by MHCM hereunder, including, without limitation, all expense items identified in Section II.13.  Nothing in this Agreement shall preclude IPA from purchasing from MHCM any items or services which otherwise are not provided by MHCM pursuant to this Agreement.

**III.9   Assistance.**  IPA agrees to cooperate with and assist MHCM, and to execute such other documents and take such other actions as may be reasonably necessary or desirable, in

©1999; All Rights Reserved
MHCM MSA 7.99

8

connection with the efficient management of the Business.

**III.10 Corporate Status.**    IPA covenants and agrees that it is presently and shall remain through the term of this Agreement, a professional corporation in good standing with the California Secretary of State.

**III.11 Board of Directors Meetings.**    IPA shall hold regular Board of Directors meetings.

**III.12 Cooperation and Authority.**    IPA covenants and agrees that it shall provide MHCM with all information and the use of such facilities as is reasonably required by MHCM to perform its services hereunder. IPA further covenants that it shall grant MHCM such authority as may be necessary or desirable to ensure MHCM's ability to perform its duties hereunder. Such authority shall include access to individual provider offices, as approved by IPA.

## ARTICLE IV
## FINANCIAL ARRANGEMENTS

**IV.1 Gross Revenue Defined.**    For purposes of this Agreement, IPA's *"Gross Revenue"* shall mean and include all payments owing to IPA for the provision of medical services to Enrollees, in accordance with generally accepted accounting principles, adjusted to reflect contractual allowances and other normal deductions from revenue, including such deductions mutually agreed upon by the Parties for charity care, bad debts and other amounts deemed uncollectible. Without limiting the generality of the foregoing, IPA's Gross Revenue shall include, or exclude as appropriate, all revenue described in each of the following categories:

(a)    Gross Revenue shall *include    capitation revenue* ( defined as revenue where payment for services provided by IPA is made to IPA periodically on a per member per month basis, percentage of premium basis or any other basis as defined by the Plan agreement) net of contractual deductions (such as withholds or POS deductions but excluding claims, except in those instances where the claim has not previously processed by MHCM), reinsurance, third party liability recoveries, stop loss recoveries, coordination of benefits, and risk pool disbursements. In the event that the Plan takes over claims processing and payment activities that were the responsibility of MHCM through this Agreement, Gross Revenue will be adjusted to reflect the deductions taken by the Plan to perform these functions. Such deductions shall include deductions in capitation that the IPA receives from the Plan as well as penalty amounts that the Plan may levy against the IPA for failure to perform functions that are the responsibility of MHCM under this Agreement.

(b)    Gross revenue shall not include:    (i) expert witness fees or speaking honoraria received by individual Physicians; (ii) *medical directorship fees received by individual*

©1999; All Rights Reserved
MHCM MSA 7.99

9

physicians.

**IV.2    Deposit of Gross Revenue.** IPA shall establish a bank account (the *"General Account"*), to be maintained by MHCM at such bank or similar financial institution as IPA and MHCM may from time to time agree (the *"Bank"*), and all Gross Revenue collected by MHCM pursuant to this Agreement shall be deposited therein. IPA agrees to account for and deliver to MHCM for deposit into the General Account, any and all Gross Revenue collected or received by IPA during the term of this Agreement. The General Account shall be used solely for depositing funds collected by MHCM or IPA and disbursing such funds in accordance with this Agreement.

**IV.3    Management Fee.** As compensation for the performance by MHCM of its obligations hereunder, IPA agrees to pay MHCM in accordance to those amounts identified in Exhibit A.

**IV.4    Credentialing Fee.** Credentialing is not MHCM's responsibility under this Agreement.

**IV.5    Fee Payment.** Within thirty (30) days of IPA's receipt of MHCM's invoice for services, IPA shall pay to MHCM the Management Fee for such month. MHCM agrees that the payment of such amounts by IPA shall constitute full and complete compensation to MHCM for all of MHCM's obligations and services rendered to IPA pursuant to this Agreement.

**IV.6    Fair Value Warranty.** Each Party represents and warrants on behalf of itself, that the aggregate benefit given or received under this Agreement has been determined in advance through a process of arms-length negotiations that were intended to achieve an exchange of goods and/or services consistent with fair market value under the circumstances, and that any benefit given or received under this Agreement is not intended to induce, does not require, and is not contingent upon, the admission, recommendation or referral of any patient, directly or indirectly, to the MHCM, or to IPA, and further, is not determined in any manner that takes into account the value of business generated between the parties.

## ARTICLE V
## TERM AND TERMINATION

**V.1    Term and Termination Without Cause.** Unless earlier terminated pursuant to the terms of either Section V.2 or V.3 below, or pursuant to any other provision of this Agreement, the term of this Agreement shall commence on July 1, 1999, and shall extend for a period of three (3) years thereafter. At the expiration of the initial term, this Agreement shall automatically extend for successive terms of two (2) years each, unless either Party gives to the

©1999; All Rights Reserved
MHCM MSA 7.99

10

other Party written notice of termination without cause at least four (4) months prior to the expiration of the then current term.

**V.2    Termination With Cause Or Cancellation.** Notwithstanding the foregoing, this Agreement may be terminated or canceled by either Party (non-defaulting Party) giving thirty (30) days prior written notice to the other Party if the other Party is in default of this Agreement. The following shall constitute events of default:

(a)    Failure by either Party to perform, keep or fulfill any material covenant, undertaking, obligation, condition or service set forth in this Agreement, including those Services and Performance Guidelines specifically set forth in Exhibits B and C, provided such failure is not cured within a period of thirty (30) days after receipt of written notice of such failure by the defaulting party.

(b)    Failure of a Party to pay any amount which may become due hereunder for a period of thirty (30) days after written notice of such failure.

(c)    Cancellation of insurance required by either Party herein.

(d)    IPA's practice of medicine is deemed illegal by any state or federal agency.

(e)    Any representations or warranties made herein by either Party are intentionally falsified or incorrect as of the effective date of this Agreement.

(f)    Either Party filing involuntary bankruptcy or an assigning of a majority of its assets for the benefit of creditors, or upon other action taken or suffered, voluntarily or involuntarily, under any federal or state law for the benefit of debtors of such Party, except for the filing of a petition of involuntary bankruptcy which is dismissed within sixty (60) days thereafter.

**V.3    Actions After Termination.** Upon the expiration or earlier termination of this Agreement, the following shall apply:

(a)    MHCM shall be paid in accordance with Article IV hereof for all agreed services rendered by MHCM to IPA prior to the expiration or earlier termination of this Agreement;

(b)    upon request of IPA, MHCM shall continue to provide claims administration for IBNR claims against a reserve account established by IPA, without additional cost or charge to the IPA, for a period of sixty (60) days following the date of termination (it being understood that all funds in the reserve account are the property of IPA and will be disbursed in accordance with this Agreement), and at the expiration of such sixty (60) day period, MHCM shall deliver to IPA a final statement of reserve account funds and IBNR claims for IPA;

(c)    MHCM further agrees that upon request by IPA, MHCM shall continue to provide claims administration for IBNR claims against a reserve account established by the IPA, on a monthly basis for a period not to exceed six (6) months following the expiration or termination of this Agreement, in exchange for the payment by IPA to MHCM of five dollars ($5.00) per adjudicated and paid claim, beginning with the sixty-first (61$^e$) day following the date

©1999; All Rights Reserved
MHCM MSA 7.99

11

of termination of this Agreement, and MHCM shall deliver to IPA a monthly statement of reserve account funds and IBNR claims for IPA, as well as a final statement of reserve account funds and IBNR claims for IPA as of the date of termination;

(d)    upon termination of the period set forth in subparagraph (b) or (c) above, whichever is applicable, MHCM shall remit to IPA all reserve account funds that remain following administration by MHCM of IBNR claims; and

(e)    in effectuating the foregoing provisions, IPA agrees that for the applicable period following the expiration or earlier termination of this Agreement, the IPA Account and General Account (and related Depository Agreements) shall be maintained, it being understood that funds in the reserve account will be disbursed in accordance with this section.

## ARTICLE VI
## INDEMNIFICATION

**VI.1    Indemnification by IPA.** IPA hereby agrees to indemnify, defend, and hold harmless MHCM, and each of MHCM's officers, directors, shareholders, agents and employees, from and against any and all claims, demands, losses, liabilities, actions, lawsuits and other proceedings, judgments and awards, and costs and expenses (including reasonable attorneys' fees), arising directly or indirectly, in whole or in part, out of any matter related to (i) the professional negligence of IPA or any professional acts or omissions of IPA to the extent that such is not paid or covered by the proceeds of insurance; and (ii) any breach by IPA in the performance of its obligations under this Agreement. IPA shall immediately notify MHCM of any lawsuits or actions, or any threat thereof, that may become known to IPA that might adversely affect any interest of IPA or MHCM whatsoever.

**VI.2    Indemnification by MHCM.** MHCM hereby agrees to indemnify, defend, and hold harmless IPA, and each of IPA's officers, MHCM's, members, agents and employees, from and against any and all claims, demands, losses, liabilities, actions, lawsuits and other proceedings, judgments and awards, and costs and expenses (including reasonable attorneys' fees), arising directly or indirectly, in whole or in part, out of any matter related to any breach by MHCM of this Agreement or any acts or omissions by MHCM in its performance of this Agreement, including but not limited to the negligence of MHCM, to the extent that such is not paid or covered by the proceeds of insurance. Notwithstanding the foregoing, MHCM shall not indemnify IPA for the acts, or failure to act, by Clinicians or Support Personnel who perform services under the direct supervision or control of any Physician at the Business. MHCM shall immediately notify IPA of any lawsuits or actions, or any threat thereof, that may become known to MHCM that might adversely affect any interest of MHCM or IPA whatsoever.

**VI.3    Survival of Obligations.** The obligations set forth in this Article VI shall survive the expiration or termination of this Agreement.

©1999; All Rights Reserved
MHCM MSA 7.99

12

## ARTICLE VII
## RESTRICTIVE COVENANTS

**VII.1  Exclusivity.**  During the term of this Agreement and except as otherwise provided herein, IPA will use MHCM exclusively for all administrative services as required for the day-to-day operations of IPA as defined in Exhibit "B" of this Agreement.

It is furthered agreed and understood that prior to entering into an agreement with any other qualified agency, for the purpose of obtaining additional administrative services, other than the specific functions that are set forth in this Agreement, IPA will notify MHCM of such intent, in writing, and MHCM will have the right of refusal to provide these additional services, at additional compensation no less than the compensation proposed to IPA in any bona fide offer from a qualified third Party.  Such right of first refusal shall expire thirty (30) days after IPA presents to MHCM a bona fide offer from a third Party qualified to provide such additional services.

**VII.2  Non-Solicitation.**  The parties agree that during the term of this Agreement and for a period of one year following termination of this Agreement, neither Party will directly or indirectly solicit any employee of the other to accept employment with that Party.

**VII.3  Non-Disclosure.**  At no time during or after the termination of this Agreement shall IPA, its partners, shareholders of partners, employees, or independent contractors, disclose, communicate or divulge to, or use for the direct or indirect benefit of any person, firm, association or company any material referred to in this Section VII.3, or any information regarding the business methods, business policies, procedures, techniques, or trade secrets, or other knowledge or processes of or developed by MHCM, or any other confidential information relating to or dealing with the business operations or activities of MHCM, made known to IPA, its shareholders, employees or agents or learned or acquired by IPA, its shareholders, employees or agents during the term of this Agreement, (collectively, "*Company Information*") except as may be expressly authorized by MHCM or any successor to it.  Immediately upon the termination of this Agreement, IPA and/or the applicable shareholder, physician employee or independent contractor, or other key employee or independent contractor shall deliver to MHCM all documents, computer discs or other forms of recorded information, including all copies thereof, containing Company Information.

**VII.4  Confidentiality of Agreement.**  IPA and MHCM acknowledge and agree that this Agreement, and the terms and conditions set forth herein, are confidential.  Each Party on behalf of itself, its agents and employees, covenants and agrees not to disclose directly or indirectly the terms of this Agreement, whether in whole or in part, to any third person or entity, except when necessary for the performance of this Agreement (*e.g.*, to MHCM's assignees), or required by

©1999; All Rights Reserved
MHCM MSA 7.99

13

law, or for the sole purpose of securing legal counsel with respect hereto. In addition, each Party further agrees not to disclose to any third party any financial or other information regarding the other Party obtained by the disclosing Party under this Agreement, regardless of when obtained, without the prior written consent of the other Party, except when necessary for the performance of this Agreement (e.g., to MHCM's assignees), or when required by law, or for the sole purpose of securing legal counsel with respect hereto.

**VII.5 Reasonableness of Restrictions.** The parties hereto acknowledge that the restrictions contained in this Article VII are reasonable and necessary to protect the legitimate interests of MHCM and IPA and that any violation of these restrictions would result in irreparable injury to MHCM and IPA. If the period of time, geographical area or scope of restricted activities or items specified in this Article VII should be adjudged unreasonable in any judicial, or any state or professional regulatory, proceeding, then the period of time or geographical area or scope shall be reduced to whatever extent the applicable authority deems to be reasonable. In the event of a violation of these restrictions, the duration of the restrictions referred to in this Article VII shall be extended by a period of time equal to that period beginning with the commencement of any such violation and ending when such violation shall have been finally terminated in good faith.

**VII.6 Severability.** If any provisions of this Article VII shall be determined to be invalid or unenforceable, either in whole or in part, this Article VII shall be deemed amended to delete or modify, as necessary, the offending provisions and to alter the balance of this Article VII in order to render the same valid and enforceable to the fullest extent permissible, as aforesaid. Additionally, the provisions of this Article VII shall be deemed to be valid to the extent of any lesser area or for any lesser duration permitted by law if the area and duration set forth herein is deemed to be too broad by a court of competent jurisdiction. The provisions of this Article VII shall be construed as an agreement independent of the other provisions of this Agreement. The existence of any claim or cause of action by either Party against the other Party shall not constitute a defense to the enforcement by either Party of the provisions of this Article VII.

**VII.7 Remedies.** The Parties acknowledge that the forgoing restrictions are reasonable and necessary to protect the legitimate interests of the respective Parties and that the Parties would not have entered into this Agreement without the restrictive covenants contained herein, that the violation of these covenants will result in irreparable injury to the affected Party, that the remedy at law for any such violation or threatened violation would be inadequate and that in the event of any such breach or violation, the injured Party, in addition to any other remedies or damages available to it, shall be entitled to injunctive or other equitable relief without the necessity of proving actual damages but such rights to relief shall not preclude the injured Party from other remedies which may be available to it hereunder.

©1999; All Rights Reserved
MHCM MSA 7.9%

14

## ARTICLE VIII
## MISCELLANEOUS

**VIII.1 Taxes and Tax Returns.**  MHCM shall be responsible for all federal, state and local taxes and contributions with respect to MHCM and persons employed by it, and MHCM shall make all returns and/or reports required in connection with any and all such laws, regulations, taxes, contributions, and benefits.  IPA shall be responsible for all federal, state and local taxes and contributions with respect to IPA and persons employed by it, and IPA shall make all returns and/or reports required in connection with any and all such laws, regulations, taxes, contributions, and benefits.  MHCM agrees to provide IPA with such financial and accounting information in the possession of MHCM in order to assist IPA in the preparation of its income tax returns, provided, however, that MHCM shall have no obligation or responsibility whatsoever to provide IPA with either tax returns or tax advice.

**VIII.2 Books and Records.**  All documents and materials including all patient charts and files, records, contracts, and other papers or documents which pertain to the Business, shall be the sole and exclusive property of IPA, provided that MHCM, at its expense, shall be entitled to retain copies of any and all such materials.  During the term of this Agreement IPA, or its respective designees, shall have reasonable access during normal business hours upon reasonable request, for inspection and copying of records maintained by MHCM in conjunction with MHCM's performance hereunder.  Notwithstanding the foregoing, IPA shall have no right to inspect or copy business or financial records of MHCM that relate solely to MHCM, or that are not generated in the ordinary course of performance by MHCM of its obligations hereunder.

**VIII.3 Assignment.**  This Agreement, being intended to secure the services of MHCM, its agents, employees and representatives, shall not be assigned, sublet or transferred by MHCM without prior written consent of IPA.  Such consent shall not be unreasonably withheld.  This Agreement shall inure to the benefit of and be binding on IPA and MHCM, their executors and administrators, including any person or entity which affiliates, merges or acquires substantially all of the assets of IPA or MHCM, or into which IPA may be consolidated or otherwise combined.

**VIII.4 Successor in Interest.**  Subject to Section VIII.3, all of the rights, benefits, duties, liabilities, and obligations of the parties hereto shall inure to the benefit of and be binding upon the parties and their permitted successors and assigns.

**VIII.5 Modification of Agreement.**  This Agreement supersedes any and all agreements, either written or oral, between the Parties, and contains all of the covenants and agreements between the Parties with respect to the subject matter hereof.  All Exhibits referred to in this Agreement are intended to and shall be incorporated into this Agreement by reference and shall be deemed to be a part of this Agreement.  Each Party to this Agreement acknowledges that no

©1999; All Rights Reserved
MHCM MSA 7.99

15

representations, inducements, promises, or agreements, oral or otherwise, have been made by either Party, or anyone acting on behalf of either Party, which are not embodied herein, and that no other agreement, statement, or promise not contained in this Agreement shall be valid or binding. This Agreement may not be modified or amended except by a written document executed by both Parties.

**VIII.6 Modification Compelled by Law.** In the event any existing state or federal law or regulation is interpreted by a judicial decision or by a regulatory agency, or any new state or federal law or regulation is enacted, so as to indicate that any provision of this Agreement may be in violation of any such law or regulation or interpretation thereof, IPA and MHCM promptly shall make diligent and good faith efforts to amend this Agreement as necessary to accommodate the law or regulation or interpretation thereof. To the maximum extent possible, any such amendment shall preserve the underlying economic and financial arrangements between IPA and MHCM. In the event that the necessary modifications cannot be agreed upon by the Parties within thirty (30) days of one Party's written request of the other to negotiate such modification, this Agreement may be terminated by either Party, upon thirty (30) days prior written notice to the other Party.

**VIII.7 Waiver; Consents.** No consent or waiver, express or implied, by either Party hereto shall be valid unless set forth in a written document executed by both Parties, and no such consent or waiver shall be deemed or construed to be a consent to or waiver of any other obligation of a Party hereunder. Failure on the part of either Party to complain of any act or failure to act of the other Party or to declare the other Party in default, irrespective of how long such failure continues, shall not constitute a waiver by such Party of its rights hereunder. The granting of any consent or approval in any other instance by or on behalf of IPA and/or MHCM shall not be construed to waive or limit the need for such consent in any other or subsequent instance.

**VIII.8 Force Majeure.** Either Party shall be excused for failures and delays in performance of its respective obligations under this Agreement due to any cause beyond the control and without the fault of such Party, including without limitation, any act of God, war, riot or insurrection, law or regulation, strike, flood, fire, explosion or inability due to any of the aforementioned causes to obtain necessary labor, materials or facilities, for so long as such event continues, and for a reasonable period of time thereafter. This provision shall not, however, release such Party from using its best efforts to avoid or remove such cause and such Party shall continue performance hereunder with the utmost dispatch whenever such causes are removed. Upon claiming any such excuse or delay for non-performance, such Party shall give prompt written notice thereof to the other Party, provided that failure to give such notice shall not in any way limit the operation of this provision.

**VIII.9 Remedies.** All rights, powers and remedies granted to either Party by any

©1999; All Rights Reserved
MHCM MSA 7.99

16

particular term of this Agreement are in addition to, and not in limitation of, any rights, powers or remedies which it has under any other term of this Agreement, at common law, in equity, by statute, or otherwise. All such rights powers and remedies may be exercised separately or concurrently, in such order and as often as may be deemed expedient by either Party. No delay or omission by either Party to exercise any right, power or remedy shall impair such right, power or remedy or be construed to be a waiver of or an acquiescence to any breach or default. A waiver by either Party of any breach or default hereunder shall not constitute a waiver of any subsequent breach or default.

**VIII.10     No Requirement to Refer.**  No provision of this Agreement, or the relationship between the parties created by this Agreement, is intended by the parties hereto to include an agreement or requirement that IPA or its Physicians utilize the services or otherwise direct the patients to facilities owned or operated by MHCM or its affiliates or as an inducement to IPA or its Physicians to make any such referral. The parties hereto agree that the benefits under this Agreement do not require, are not payment for, and are not in any way contingent upon the admission, referral or other arrangement for the provision of any item or service reimbursed under Medicare or Medi-Cal.

**VIII.11     Headings.**  The headings of the Sections and Articles of this Agreement are inserted for convenience of reference only and shall not in any manner affect the construction or meaning of anything herein contained or govern the rights or liabilities of the parties hereto.

**VIII.12     Notices.**  All notices, requests, and communications required or permitted hereunder shall be in writing and shall be sufficiently given and deemed to have been received upon personal delivery or delivery by overnight courier or, if mailed, upon the first to occur of actual receipt or seventy-two (72) hours after being placed in the United States mail, postage prepaid, registered or certified mail, receipt requested, addressed to the parties as follows:

> If to IPA:        Northridge Medical Group, Inc,
>                   18350 Roscoe Blvd., Suite 700
>                   Northridge, CA  91325
>                   Attention:  President
>
>
> If to MHCM:       Meridian Health Care Management, LP
>                   21045 Califa St.
>                   Woodland Hills, CA 91367
>                   Attention:  President

Notice of a change in address of one of the parties shall be given in writing to the other Party as provided above, but shall be effective only upon actual receipt.

©1999; All Rights Reserved
MHCM MSA 7.99

17

**VIII.13    Non-discrimination.** IPA and MHCM will not discriminate on the basis of race, sex, age, religion, national origin, or handicap in providing services under this Agreement or in the selection of employees or independent contractors.

**VIII.14    Counterparts.** This Agreement may be executed in exact counterparts and when so executed by the parties hereto shall be effective in accordance with the terms hereof.

**VIII.15    No Third Party Beneficiary.** None of the provisions herein contained are intended by the parties, nor shall they be deemed, to confer any benefit on any person not a Party to this Agreement.

**VIII.16    Governing Law.** This Agreement shall be governed by the laws of the State of California.

**VIII.17    Language Construction.** The language in all parts of this Agreement shall be construed, in all cases, according to its fair meaning, and not for or against either Party. Any rule of law, or any legal decision that would require interpretation of any claimed ambiguities in this Agreement against the Party that drafted it has no application and is expressly waived.

**VIII.18    Dispute Resolution.** In the event of a dispute between the Parties to this Agreement, the Parties agree that the following procedure will be used in an attempt to resolve the dispute prior to the pursuit by any Party of other available remedies:

(a)    A meeting (the "Initial Meeting") shall promptly be held at which all Parties are present or represented by individuals with full decision making authority regarding the matters in dispute.

(b)    If within thirty (30) days following the Initial Meeting the Parties have not succeeded in negotiating a resolution of the dispute, the dispute shall be submitted to mediation facilitated by a mediator ("Mediator"). Such Mediator shall be a retired judge or mature practicing attorney with experience relevant to this Agreement. Each Party shall bear its proportionate share of the costs of the mediation, including the Mediator's fee.

(c)    The Parties agree to participate in good faith in the mediation and negotiations related thereto in the Initial Meeting and in all mediation conferences.

(d)    If within a period of sixty (60) days following the mediation conference or any adjournment thereof, the parties are unable to resolve the dispute, the Parties agree to submit such dispute to Arbitration. Such arbitration shall be settled in accordance with the rules of commercial arbitration of the American Arbitration Association and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. Such arbitration shall occur within the County in which MHCM offices are located, unless the parties mutually agree to have such proceeding in some other locale. The arbitrator(s) may in any such proceeding award attorneys' fee and costs to the prevailing Party.

©1999; All Rights Reserved
MHCM MSA 7.99

18

**VIII.19**     **Attorneys' Fees.**  If legal action is commenced by either Party to enforce or defend its rights under this Agreement, or to interpret or enforce this Agreement, the prevailing Party in such action shall be entitled to recover its costs and reasonable attorneys' fees from the other Party, in addition to any other relief granted.

**VIII.20**     **Time is of the Essence.**  Time is hereby expressly declared to be of the essence in this Agreement.

IN WITNESS WHEREOF, the parties have hereunto set their hand as of the day and year first above written.

<table>
<tr><td>"MHCM"</td><td>"IPA"</td></tr>
<tr><td>Meridian Health Care Management, A Delaware Limited Partnership.<br>By Meridian Health Care Consulting Inc,. A California Corporation, its General Partner.</td><td>Northridge Medical Group, Inc.<br>a California professional medical corporation</td></tr>
</table>

By: _____          By: _____

Its:   President                     Its:   President

Date:   8|3|99                       Date:   7/30/99

©1999; All Rights Reserved
MHCM MSA 7.99

19

EXHIBIT "A"

COMPENSATION

MHCM shall be compensated as follows:

A.    For development, and initial set-up: to include implementation services, initial information system set-up, loading into MHCM information system of all IPA provider files, member eligibility files, contract benefit tables and fee schedules via electronic or magnetic media, and recruitment and training of all MHCM staff necessary to support MHCM's responsibilities hereunder, team meetings with IPA, development activities, as requested, IPA shall pay MHCM the following:

> IPA shall pay MHCM a payment of Forty Thousand dollars ($40,000.00) in accordance to the following schedule:

  - 33.3% ($13,500) upon signature of this Agreement.
  - 33.3% ($13,500) on the date the first Plan agreement between IPA and Plan becomes effective (expected to be August 1, 1999).
  - 33.3% ($13,000) upon successful completion of the implementation of this Agreement (see Exhibit C for definition).

B.    In addition to any fees paid to MHCM under Section A of this Exhibit, commencing immediately on the date that MHCM begins to perform any of the services described in Exhibit "B" of this Agreement, which date is expected to be August 1, 1999, IPA shall remit to MHCM, within thirty (30) days of IPA's receipt of MHCM's invoice for services, a monthly payment equal to **11.5%** of Gross Revenue, as defined in Article IV.1(a) of this Management Services Agreement

C.    Notwithstanding Section B of this Exhibit, the monthly fee paid to MHCM for providing management services as described in Exhibit "B" hereof shall be a minimum of $10,000 Thousand dollars per month, effective October 1, 1999.

©1999, All Rights Reserved
MHCM MSA 7.99

D.    All expenses directly related to the performance of services under Article II and Exhibit "B" of this Management Services Agreement shall be borne by MHCM, excluding the following:

- IPA legal expenses.
- Accounting expenses for year end taxes, audits and special accounting services other than the day-to-day operation of IPA.
- IPA Board, committee and Medical Director fees
- Design, printing and duplication expenses for medical encounter and referral forms, IPA stationery, newsletters and other marketing materials.
- IPA insurance premiums, including but not limited to: reinsurance, directors and officers, professional or general liability, and as approved by IPA.
- Costs incurred, with prior approval of IPA, for IPA's membership, Board or committee meetings, excluding costs for routine preparation of information packets, presentation materials and other routine items.
- Space rent, furnishings and equipment for office space located within IPA's primary service area (as defined in Article III, Section B of this Agreement) and used by MHCM, with IPA's approval, to perform the services required under this Agreement.

E.    For additional services not included in Exhibit "B", but requested and approved by IPA, MHCM shall be paid as follows:

| | |
|---|---|
| $235.00 per hour | Executive level staff |
| $160.00 per hour | Director or management  staff |
| $ 50.00 per hour | Support Staff |

In additional to these hourly rates: IPA agrees to reimburse MHCM, with IPA's prior approval, and upon receipt of appropriate invoice and documentation, for all reasonable travel (excepting travel between the offices of MHCM and IPA), hotel, postage, copying and other out-of-pocket expenses. All such expenses shall be billed at MHCM's cost.

**EXHIBIT "B"**
**OPERATIONAL MANAGEMENT SERVICES TO BE PROVIDED BY MHCM**

A. General Management and Administration.

1. Supervising and coordinating day-to-day non-medical business aspects of IPA.
2. Providing administrative support for interface with physicians, including voice mail access to MHCM staff at any time. Making best efforts to return as quickly as possible IPA voice mail messages, including voce mail messages received outside of normal business hours.
3. Providing the services of a consulting Medical Director who shall assist IPA in the provision of medical, administrative, peer review and utilization management services to IPA, including, but not limited to:
4. Consulting on Payor/IPA communications pertinent to medical matters.
5. Assisting in resolving any grievances between IPA and Payors pertinent to all medical matters.
6. Consulting on resolving IPA/Payor Member grievances pertinent to medical matters.
7. Consulting on IPA's medical and hospital referral authorization procedures.
8. Interfacing with IPA provider's office staff to monitor IPA's medical and hospital referral authorization procedures.
9. Coordinating medical administrative support prior to and at all Utilization Management and Quality Management Committee Meetings.
10. Providing clerical and secretarial support adequate to meet functions of IPA, its employees and its Board of Directors.
11. Coordinating printing of all forms and correspondence.
12. Processing all incoming and outgoing mail.
13. Maintaining a liaison with Payors where necessary to obtain/submit data, etc.
14. Preparing ad-hoc reports as requested by IPA.
15. On-going provision of computerized management information system.
16. Display capability of the software and up to five days of system training
17. Encounter receipt and processing in accordance with Health Plan requirements
18. Purchased service claim receipt and processing

B. Financial Management.

1  Establishing bookkeeping and accounting systems including the maintenance, custody and supervision of all of IPA's business records and the preparation, distribution and recordation of all bills and statements for professional services rendered by IPA, including billing and completion of reports and forms required by prepaid health plans, employers, insurance companies, governmental agencies and other third party payors.

©1999; All Rights Reserved
MHCM MSA 7.99

3

2  Establishing an annual budget that reflects major operating objectives and anticipated revenues, expenses and cash flow.

3  Maintain bank accounts and supervise short term investments and money management.

4  Preparing financial statements on a monthly basis to include a balance sheet, statement of revenue and expenses, and cash flow for IPA's operations for such month and a statement of accounts receivable.  Such statements to be produced on both a cash and accrual basis of accounting.

5  Establishing and maintaining an accounts payable system.

6  Administering a claims processing system, including, but not limited to:
   a  Receiving completed claim forms from IPA providers.
   b  Entering data in computerized database.
   c  Generating reports required by Payors.
   d  Adjudicating and paying claims pursuant to IPA's instructions and policies.
   e  Reviewing available cash versus payable claims.
   f  Generating reports required by IPA for utilization management and financial review.

7  Administering capitation distribution from prepaid Payors, including but not limited to:
   a  Receiving and depositing capitation payments.
   b  Reconciling capitation payments with eligibility lists and other pertinent reports.
   c  Preparing budgets for internal IPA management.
   d  Distributing primary care physician ("PCP") capitation payments and explanation of benefits.

8.  Distributing specialty physician payment based upon authorized referrals and explanation of benefits or other such reimbursement methodologies as determined by the IPA.
   a  Producing reports and collecting reimbursement for insured and reinsured services.
   b  Providing third party payor information for coordination of benefits and billing other payors for COB and other third party liability payments in accordance to the terms of the Plan agreement.
   c  Distributing payments to all ancillary and administrative providers.
   d  Preparing monthly, quarterly, and yearly financial statements and accounting protocols.

9.  Assistance in developing bonus distribution methodologies and distributing any such bonuses and or other risk sharing in accordance with bonus distribution methodologies.

10. Preparation of 1009s for all providers and vendors.

11. Establishment of internal control procedures designed to minimize opportunities for

12. misappropriation of IPA fund.

©1999; All Rights Reserved
MHCM MSA 7.99

4

C. Risk Pool Administration. (If data is provided by Payors or Providers).

1. Entering charges against risk pool(s) in computerized database.
2. Generating reports of charges against risk pool(s).
3. Verifying accuracy and validity of reports produced by Payors.
4. Reconciling risk pool(s) accounts with Payors and any internal arrangement between hospital and IPA.

D. Management Information System. Provide a management information system to include the handling of accounts receivable, accounts payable, patient tracking, claims processing, utilization analysis, and eligibility determination. MIS system to be available and accessible to IPA at all times (minimal downtime)

E. Insurance and Risk Management.

1. Providing recommendations regarding professional liability insurance, comprehensive liability insurance, workers' compensation insurance and disability insurance.
2. Coordinating IPA's risk management program.

F. Patient Eligibility.

1. Obtaining eligibility lists from Payors.
2. Assisting with determination of eligibility of patients for health care coverage prior to provision of medical services.
3. Maintaining computerized eligibility database.
4. Reconciling retroactive denial of eligibility against provision of medical services and authorization process by IPA against appropriate health care benefit agreement.
5. Administering system for retroactive eligibility determination.
6. Distributing eligibility reports to appropriate IPA providers, hospital staff and IPA.

G. Provider Recruiting. Assist in recruiting and negotiating contracts with new providers.

H. IPA Provider Data.

1. Obtaining approved IPA provider applications from IPA.
2. Negotiating agreements with IPA providers.
3. Presenting complete provider applications and contracts for IPA approval.
4. Maintaining data in computerized eligibility database.
5. Tracking client provider contract renewal dates.
6. Distribution of updated IPA provider lists, as appropriate.

©1999; All Rights Reserved
MHCM MSA 7.99

5

I.  Provider Relations.

    1.  Providing resources to train IPA providers and office staff in IPA's policies and procedures.
    2.  Distributing IPA's forms to IPA providers.
    3.  Assisting IPA in development and updating of a IPA manual.

J.  Education.

    1.  Educating physicians regarding IPA's polices and procedures.
    2.  Educating of Patients of IPA regarding third party payors.
    3.  Coordinating health education and wellness programs to Patients of IPA.

K.  Managed Care Contracting.

    1.  Implementation of managed care contracts and assistance in negotiation, if requested.
    2.  Negotiating agreements with hospital and ancillary providers within IPA service area.
    3.  Tracking contract renewal dates for agreements with third party payors.

L.  Liaison with Third Party Payors Contracting with IPA.

    1.  Coordinating communications with third party payors.
    2.  Providing third party payors with rosters of physicians in IPA, obtain provider health plan numbers, audit directories for accuracy.
    3.  Informing third party payors of roster changes.
    4.  Coordinating IPA network and office expansion to meet requirements of third party payors.
    5.  Assisting in resolving any grievances between IPA and third party payors.
    6.  Assisting in resolving patient grievances.

M. Utilization Management, Quality Management and Medical Policy Committee Functions.

    1.  Administering managed care medical and hospital referral authorization procedure (include recommendations and policies and procedures for prior authorization of elective, urgent and emergent ambulatory and hospital services).
    2.  Designing, developing and implementing a physician education program and claims analysis program.

©1999; All Rights Reserved
MHCM MSA 7.99