3. Providing administrative assistance prior to and at all managed care Utilization Management, Quality Management and Medical Policy Committee Meetings (e.g. meeting schedules, set-up, agenda, minutes) and provide administrative assistance to IPA's Medical Director.

4. Providing administrative support when applicable at each managed care Utilization Management Committee meeting pertinent to health benefits, billing information, referral authorization process, referral and practice patterns, compliance with referral authorization process, referral limitations, monitoring of coding procedures and utilization guidelines.

5. Providing administrative support for all managed care Quality Management activities as they relate to non-medical policy and procedure development, data collection, meeting administration, documentation of finds, monitoring of IPA developed requirements for medical record documentation and responses to member grievances.

6. Providing administrative support for the managed care Medical Policy Committee as it relates to non-medical policy and procedure development, meeting administration, documentation of finds, and consistent application of non-medical adopted polices.

7. Developing a Provider Profiling system which includes a database of information relating to provider practice patterns, referral behavior and utilization of hospital, specialty and ancillary resources.

**REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK**

©1999; All Rights Reserved
MHCM MSA 7 99

# EXHIBIT C

# PERFORMANCE

IPA and MHCM agree that certain specific performance standards, measurement criteria, measurement period, penalties and bonuses as detailed in this Exhibit are required. IPA and MHCM shall measure results quarterly and jointly evaluate them. MHCM will provide IPA with monthly contract compliance reports within fifteen (15) days of the completion of each month.

## Performance Guidelines

**A.** *Claims Compliance*

All claims counted for purposes of evaluating performance shall exclude those claims where IPA has not provided eligibility, contract information, or authorization information to permit adjudication of the claim.

1. Regulatory Compliance for Claims

The following standards will be adhered to:

*Medicare Claims*
- 95% of clean claims from noncontracted providers will be processed within 30 calendar days or within standards required by health plans.
- 95% of unclean and contracted claims will be processed within 60 calendar days or within standards required by health plans.

*Commercial/Medi-Cal claims*
- 95% of clean claims will be processed within 60 calendar days or within standards required by health plans.

©1999; All Rights Reserved
MHCM MSA 7.99

R

2.    Payment Accuracy

The following standards will be adhered to:

- 98% of all claims in sample paid correctly in accordance with contract terms and conditions.

3.    Encounter Reporting

95% of encounters will be reported to the HMOs within the required time period.
MHCM will identify to IPA those PCPs and capitated specialists who are not compliant with encounter reporting and jointly develop a plan to improve encounter reporting

**B.    Authorizations**

1.    Authorization Turn Around

Processing of authorizations will meet the following standards:
Note: time measurement begins when the authorization is received in MHCM office and ends when the authorization is approved and provided to the requesting physician.

Emergent authorizations:     Immediate
Urgent authorizations          2 hours
Non-urgent authorizations    2 business days

2.    On-line Authorizations using MHCM Web based system.

Standard:     All PCPs will have access to the MHCM system within ninety (90) days of the effective date of this Agreement.

Standard:     MHCM will maintain a fax-based back-up system for authorizations processing

©1999; All Rights Reserved
MHCM MSA 7.99

C.    *Implementation and administration of Specialty and Ancillary Provider Reimbursement Methodologies*

1.    Specialty zero based budgeting methodology and/or contact cap reimbursement

Standard:    MHCM will work with IPA to administer and monitor specialty zero based budgeting reimbursement system.

Standard:    MHCM will work with IPA to administer and monitor a contact cap reimbursement methodology for identified specialties.

Standard:    MHCM will work with IPA to identify the most appropriate reimbursement methodology for various specialties.

D.    *Successful Implementation Definition.*

In accordance with the set-up fee payment schedule identified in Exhibit A, MHCM and IPA agree that "Successful Implementation" will be defined as follows:

> 90% of items identified in the attached "Implementation Checklist" (attached) completed by Day 1 (Day 1 defined as the first day that the first Plan Agreement becomes effective).

NOTE:  Attach MHCM Implementation Checklist

©1999; All Rights Reserved
MHCM MSA 7.99

**Amendment 001**
**to**
**Management Services Agreement**

This Amendment is entered into by and between Meridian Health Care Management, Inc. (MHCM) and Northridge Medical Group, Inc. (Client) as of the FIRST (1st) day of September, 1999 amending the Management Agreement effective August 1, 1999.

The parties hereby agree that:

1. Exhibit "A", Section B. is deleted in its entirety and replaced as follows:

   B. In addition to any fees paid to MHCM under Section A of this Exhibit, commencing September 1, 1999, IPA shall remit to MHCM, within thirty (30) days of IPA's receipt of MHCM's invoice for services, a monthly payment equal to **11.6%** of Gross Revenue, as defined in Article IV.1 (a) of this Management Services Agreement.

2. Exhibit "B" is revised to include Section N. as follows:

   N. <u>Coordination of Credentialing Activities</u>.
   1. Preparing provider credentialing packets for distribution
   2. Coordinating with CheckPoint, as appropriate
      a. Sending completed provider credentialing packets to CheckPoint for PSV.
      b. Receiving completed CheckPoint verification information and place in provider files.
   3. Sending complete provider applications to Payors requiring copies.
   4. Coordinating Payor required provider site visit reports conducted by Marlborough Medical Management.
   5. Coordinating information received with Client's Medical Director; reviewing provider files with Client's Medical Director.
   6. Maintaining credentialing data in MHCM database and appropriate provider files.
   7. Staffing Client credentialing committee meetings as frequently as necessary to conduct business.
      a. Taking and maintaining minutes.
   8. Maintaining and updating Credentialing Policies and Procedures to ensure compliance with NCQA and Payor requirements.
   9. Coordinating recredentialing activities with Checkpoint and Marlborough Medical Management.
      a. Sending out notices and collect information required for recredentialing.
   10. Coordinating Payor audit site visits for those Payors that delegate credentialing activities to Client.
   11. Coordinating Payor quality assurance activities that relate to credentialing issues.

12. Reporting administrative issues to state agencies, as appropriate and directed by
Client.

3. All other provisions not inconsistent shall remain in full force and effect.

By:                                          By:

Meridian Health Care Management, Inc.        Northridge Medical Group, Inc.

_Gertrude S Carter, m.d._

_DBRoss_                                     _____
Dolores B. Ross                              Signature

                                             _President_
Executive Vice President                     Title
Title
Date: __2/15/00__                            Date: __2/17/00__

**Amendment 002**
**to**
**Management Services Agreement**

This Amendment is entered into by and between Meridian Health Care Management, Inc. (MHCM) and Northridge Medical Group, Inc. (Client) as of the twenty-eighth (28th) day of September, 2000 amending the Management Agreement effective August 1, 2000.

The parties hereby agree that:

1. Article II.5 is deleted in its entirety and replaced as follows:

   II.5 **Utilization and Quality Management.** MHCM shall provide such utilization and quality management services as are reasonable necessary for the operations of the Business. These services shall include eligibility verification, concurrent review for out of network and out of area admissions, case management, specialty referral review, claims review, and hospital and utilization tracking and information management and coordination with hospital utilization management and case management staff in accordance with Exhibit "B". All services shall be performed in accordance with written utilization and quality management policies and procedures developed in consultation with MHCM.

2. Exhibit "A", Section B. is deleted in its entirety and replaced as follows:

   B. In addition to any fees paid to MHCM under Section A of this Exhibit, commencing August 1, 2000, IPA shall remit to MHCM, within thirty (30) days of Client's receipt of MHCM's invoice for services, a monthly payment equal to eleven and ninety-five hundredths percent (11.95%) of Gross Revenue, as defined in Article IV.1 (a) of this Management Services Agreement.

3. Exhibit "A" is revised to include Section F. as follows:

   F. For any medical management service Client or designee (including but limited to Northridge Hospital Medical Center (NHMC) or consultants) has requested or approved outside the scope of this Agreement as set forth in Exhibit "B", Client agrees to compensate MHCM at a rate of $34.00 per hour per FTE required to perform needed services within thirty days of Client's receipt of MHCM's invoice for services.

4. Exhibit "B", Sections O., P. and Q. are created as follows:

   O. Concurrent Review/Discharge Planning Services.

1. In-patient Concurrent Review
   a. Out of Area – Notifying health plans and hospitalist of out of area (as defined in Client's health plan contracts) admissions, coordinating initial reviews and continued reviews, as appropriate per health plan contract. Such reviews include applicable systems documentation and patient/provider notifications.
   b. Admissions outside of NHMC Roscoe and Sherman Way campuses and affiliated skilled nursing facilities – Coordination with Client's contracted hospitalist vendor for transfer of patients back into the NHMC system. MHCM shall provide concurrent review services for those patients admitted to hospitals (acute and skilled nursing facilities) outside the NHMC system until such patients are stable for transfer back into the NHMC system. Such services include applicable systems documentation and patient/provider notifications. NHMC shall be responsible for concurrent review/discharge planning services, inclusive of applicable systems documentation and patient/provider notifications, for admissions to NHMC acute facilities and for concurrent review/discharge planning services for admissions to NHMC skilled nursing facilities.—MHCM shall be responsible for the applicable systems documentation (as provided by NHMC) and patient notifications to NHMC for delivery to patient/representative for skilled nursing concurrent review/discharge planning services.

P. Case Management Services
1. Catastrophic Case Management
   a. Management of complex, catastrophic care as referred to MHCM from NHMC, Client or designee (including but not limited to NHMC, hospitalist or consultants) inclusive of applicable systems documentation and patient/provider/health plan notifications.

2. Community Case Management
   a. Management of chronic patients through continuums of care outside the facility setting (e.g. home health, DME services) inclusive of applicable systems documentation and patient/provider/health plan notifications. Community case management does not include any Disease State Management services.

Q. All other medical management services provided by MHCM shall be subject to the compensation as set forth in Exhibit "A", Section F.


5. MHCM and Client agree that should Client wish to modify the responsibilities of either party relative to this Amendment 002, Client shall provide MHCM with ninety (90) days notice. During that ninety (90) day period Client and MHCM agree to meet and negotiate a modification which is mutually agreeable.

6. All other provisions not inconsistent shall remain in full force and effect.

By:

Meridian Health Care Management, Inc.

_____

Dolores B. Ross

Executive Vice President
Title

Date: _____

By:

Northridge Medical Group, Inc.

_Gertrude S Carter, MD_
Signature

_President_
Title

Date: _10/30/2000_

NIPA Amendment 002
09/28/00

**Meridian**
Health Care Management, Inc.

Amendment 003
to
Management Services Agreement

AUG 2002
Received

This Amendment is entered into by and between Meridian Health Care Management, Inc. ("MHCM") and Northridge Medical Group, Inc. ("IPA") as of this 1st day of Aug 2002 amending the Management Services Agreement ("MSA") entered into by the parties effective July 1, 1999, and its Amendment 001 entered into effective September 1, 1999 and its Amendment 002 entered into effective August 1, 2000

The parties hereby agree that:

1. This Amendment shall be effective as of the first day of August, 2002.

2. The term of the MSA shall be extended for two (2) years effective August 1, 2002.

3. Exhibit "A" Section B. of the MSA is deleted in its entirety and is replaced with the following:

> Effective on August 1, 2002, IPA shall remit to MHCM, within thirty (30) days of IPA's receipt of MHCM's invoice for services, a monthly payment equal to:
> i.   Ten and one-half percent (10.50%) of Gross Revenue, as defined in Article IV.1(a) of the Management Services Agreement, not to exceed $4.35 Per Member Per Month ("PMPM") for commercial and POS members and $26.75 PMPM for senior members **less**
> ii.  Ten Thousand Dollars ($10,000.00) to reflect the reduction in staff and services provided by MHCM related to this Amendment, **plus**
> iii. One hundred twenty-five percent (125.00%) of the direct cost of salaries/wages for MHCM employees specifically dedicated to IPA support and under the direct supervision of IPA Executive or Medical Director ("IPA Support Staff") as described in Exhibit B.H.14-16 attached hereto, **plus**
> iv.  Three hundred forty dollars ($340.00) per month per IPA Support Staff and IPA Executive and Medical Director to offset MHCM direct costs for office space, furniture, telephone, computer equipment, printer access, fax access and mail support ") as described in Exhibit B.H.14-16 attached hereto.
> v.   For primary source provider credentialing, if provided by MHCM, a fee of one hundred twenty-five dollars ($125.00) per initial credentialing and seventy-five dollars ($75.00) per re-credentialing.

NMG Amendment 003 020801.doc

Page 1 of 2



4. Exhibit "A" Section C. of the MSA is deleted in its entirety and is replaced with the following:

> Notwithstanding Section B of this Exhibit, the monthly fee paid to MHCM for providing management services as described in Exhibit "B" hereof shall be a minimum of fifty thousand dollars ($50,000.00) per month, effective July 1, 2002.

5. Exhibit "B" of the MSA is deleted in its entirety and replaced with Exhibit "B" attached hereto.

6. Exhibit "C" of the MSA is deleted in its entirety and replaced with Exhibit "C" attached hereto.

7. Amendment 001 to the MSA is deleted in its entirety.

8. Amendment 002 to the MSA is deleted in its entirety.

9. All terms and conditions of the MSA and Amendments 001 and 002 not inconsistent herewith shall remain in full force and effect.

IN WITNESS WHEREOF, the parties have hereunto set their hand as of the day and year first above written.

Meridian Health Care Management, Inc. ("MHCM")

_____          8|1|02
Michael X. Alper, President & CEO          Date

Northridge Medical Group, Inc. ("IPA")

_____          11-20-0 L
Gertrude Carter, MD, President             Date

Sikander Kajani, M.D.                      7|29|02
Vice President                            Date

NMG Amendment 003 020801.doc

# EXHIBIT "B"
# SERVICE MATRIX

| | | | IPA | MHCM |
|---|---|---|---|---|
| **A.** | **MANAGEMENT INFORMATION SYSTEM** | | | |
| | 1. Provide a computerized management information system to process and store the following: | | | X |
| | | a. Member eligibility files | | X |
| | | b. Provider demographic files | | X |
| | | c. Provider vendor files | | X |
| | | d. Provider fee schedules | | X |
| | | e. Benefit packages | | X |
| | | f. Referral/authorization requests | | X |
| | | g. Claims record | | X |
| | | h. Capitation payments | | X |
| | | i. Accounts receivable | | X |
| | | j. Accounts payable | | X |
| | 2. Provide appropriate PRIMEridian™ data security | | | X |
| | | a. Restrict access to data to all non-MHCM personnel | | X |
| | | b. Restrict access to data to specific Client-specified individuals | | X |
| | | c. Restrict access to data by user and security classification | | X |
| | 3. Provide PRIMEridian™ emulation software for use by Client at Client location(s) | | | X |
| | 4. Provide technical support | | | X |
| | | a. Connectivity to MHCM systems at Client location(s) | | X |
| | | b. Availability of PRIMEridian DIRECT™ | | X |
| | 5. Provide client training on MHCM systems | | | X |
| | | a. At Client site | | X |
| | | b. At Client Provider sites | | X |
| | | c. At MHCM training facility | | X |
| **B.** | **CLAIMS MANAGEMENT** | | | |
| | 1. PROCESSING | | | |
| | | a. Receive electronic UB92 claim data from Client and/or Client providers via a claims clearinghouse | | X |
| | | b. Receive electronic HCFA 1500 format claims data from Client and/or Client providers via PRIMEridian DIRECT™ or via a claims clearinghouse | | X |
| | | c. Receive via mail completed HCFA 1500 and UB92 claim forms from Client providers | | X |
| | | d. Digitally image claims and upload nightly to PRIMEridian™ | | X |
| | | e. Enter claims data into PRIMEridian™ | | X |
| | 2. ADJUDICATION | | | |
| | | a. Adjudicate claims in accordance with Client's instructions, policies, provider and payor contracts. | | X |
| | | b. Match completed claim to authorization record when required by Client policies | | X |
| | | c. Prohibit adjudication of claims without authorization in accordance with Client policies | | X |
| | | d. Allow re-adjudication of previously unauthorized claims when authorization is properly acquired | | X |
| | | e. Validate claim coding for appropriate diagnosis(es), procedure(s), etc. | | X |
| | | f. Adjudicate co-payment, co-insurance and/or deductible for each claim | | X |
| | | g. Adjudicate benefit limits and coverage | | X |
| | | h. Calculate allowed payment according to Client specified fee schedule(s) | | X |
| | | i. Support multiple fee schedules for Client providers (within acceptable parameters) | | X |
| | | j. Support periodic adjustments to fee schedules | | X |
| | | k. Track other primary health insurance coverage for COB Include an item to treat commercial members over 65 as Medicare prime. | | X |
| | | l. Adjudicate COB to be paid by other primary Payor(s) | | X |
| | | m. Adjudicate TPL to be paid by other primary Payor(s) | | X |
| | | n. Track payments made by primary Payor | | X |
| | 3. PAYMENT | | | |
| | | a. Release payable claims to Providers in compliance with Payor, state, HCFA mandated timeframes and other requirements (as cash allows) | | X |
| | | b. Work with client to resolve issues preventing compliance with Payor, state, and HCFA-mandated timeframes or other requirements for paying claims | | X |
| | | c. Aggregate multiple claims by individual vendor (potentially multiple providers) within a check | | X |

Page 1 of 6

| | | IPA | MHCM |
|---|---|---|---|
| | run into single payment and explanation of payment | | X |
| d. | Generate claim denial letters | | X |
| **4.** | **REPORTING** | | X |
| a. | Generate claims history reports as required by Payors or HCFA | | X |
| b. | Generate standard claims history reports by date of service and date paid. | | X |
| c. | Generate standard data warehouse files when requested by Client | | X |
| d. | Generate EDI submission of HCFA 1500 and UB92 encounter data to Payors | | X |
| e. | Generate EDI submission of insured services to Payors | | X |
| f. | Generate IBNR calculation | | X |
| g. | Generate detailed encounter reports | | X |
| h. | Generate referral, utilization, and cost reports based on claim data per Client request | | X |
| i. | Track claims cost by service by member by provider by medical group by specialty, by place of service | | X |
| j. | Generate report on stop loss submissions and recoveries by claim by member | | X |
| k. | Generate quarterly/annual report(s) on aggregate stop loss receivables and recoveries | | X |
| l. | Generate TPL reporting | | X |
| m. | Generate COB reporting | | |
| **C.** | **MEDICAL MANAGEMENT** | | |
| **1.** | **REFERRAL DATA ENTRY AND PROCESSING** | | X |
| a. | Provide capability for Client or Client providers to enter referral requests into **PRIMEridian DIRECT** or **PRIMEridian™**. | | X |
| b. | Receive routine prospective and retrospective referral requests via fax and **PRIMEridian DIRECT™** from Client providers | | X |
| c. | Receive urgent or emergent referral requests via telephone from Client providers | | X |
| d. | Enter referral requests into **PRIMEridian™** | | X |
| e. | Assign computer generated tracking number to each referral request | | X |
| f. | Perform eligibility verification of member | | X |
| g. | Issue approval by non-clinical staff to referral requests in strict accordance with Client's instructions and policies | | X |
| h. | Issue approval by clinical staff to referral requests in strict accordance with Client's instructions and policies | | X |
| i. | Send via fax and/or **PRIMEridian DIRECT™** computer generated notice of approval to providers involved in the referral request in strict accordance with Client's Payor contracts, instructions and policies | | X |
| j. | Send via U.S. mail computer generated notice of approval to member | | X |
| k. | Send to requesting provider notice describing Client's need for additional data prior to authorization of referral request in strict accordance with Client's instructions and policies | | X |
| l. | Send to providers involved in the referral request notice of denial via fax in strict accordance with Client's instructions and policies | | X |
| m. | Send via U.S. mail to member notice of denial in strict accordance with Client's Payor contracts instructions and policies | | X |
| n. | Prepare agenda and minutes for Utilization Management Committee (UMC) meetings with assistance from MHCM as necessary | X | |
| o. | Provide pertinent reports for UMC meetings | X | X |
| p. | Attend UMC meetings with assistance from MHCM as necessary | X | |
| q. | Facilitate UMC meetings with assistance from MHCM as necessary | X | |
| **2.** | **UTILIZATION REVIEW** | | |
| a. | Prospective and Retrospective Review | | X |
| i. | Generate daily log of referral requests requiring action by Client | | X |
| ii. | Send to Client via fax or **PRIMEridian DIRECT™** daily log of referral requests requiring action by Client | | |
| iii. | Client will review daily log of referral requests and denote action to be taken for each referral request contained in log. Such direction from Client shall include the following: authorize, deny, or request for additional data. | X | |
| iv. | Enter action into **PRIMEridian™** and issue authorization, denial, or request for additional data for each referral request contained in daily log in strict accordance with Client's instructions and policies | | X |
| v. | Enter into **PRIMEridian™** the requested new data to each referral request as applicable. | | X |
| vi. | Allow a single tracking number for multiple services by place of service or provider requested | | X |

Confidential and Proprietary Meridian Health Care Management, Inc.
NMG Amendment 003 Exhibit B 020801.doc

| | | | IPA | MHCM |
|---|---|---|---|---|
| | | | | X |
| | vii. | Track pre-certified admissions by provider and by facility | | X |
| | viii. | Check authorizations for conformity with Client's adopted critical pathways or clinical protocols | | X |
| | ix. | Check appropriateness of location and delivery modality of requested services | | X |
| b. | | Concurrent Review and Case Management (In area, out of area, skilled nursing, and durable medical equipment, which does not meet automatic approval criteria) | | |
| | i. | Identify inpatient admissions for which Client and/or Payor(s) require concurrent review | X | |
| | ii. | Create a tracking number via **PRIMEridian™** for each admission | X | |
| | iii. | Document appropriate concurrent review and discharge planning data for each admission in **PRIMEridian™** | X | |
| | iv. | Provide on-site UR Nurse to perform daily chart reviews | X | |
| | v. | Provide UR nurse to perform daily chart reviews telephonically | X | |
| | vi. | Perform concurrent length-of-stay reviews | X | |
| | vii. | Perform case management and discharge planning, including durable medical equipment referrals which does not meet automatic approval criteria. | X | |
| | viii. | Provide patient data for hospital admissions | | |
| c. | | Reporting | | |
| | i. | Track consolidated or by provider referral request turn around time per NCQA standards | | X |
| | ii. | Track bed day activity by length of stay, facility, Payor, commercial/senior status, admit/discharge diagnosis and level of care per NCQA standards | | X |
| | iii. | Report on aberrant inpatient as identified by Case Manager | | X |
| | iv. | Compile demographic information on patients treated by Client | | X |
| | v. | Track referrals by member, provider, group, specialty, place of service, referral submission date, admit/discharge date, Payor and/or diagnosis | | X |
| | vi. | Track location of services by member by provider by medical group by specialty by place of service | | X |
| **3.** | | **QUALITY MANAGEMENT** | | X |
| a. | | Assist with development of Client's Quality Management Program | | X |
| b. | | Prepare agenda and minutes for Quality Management Committee (QMC) meetings | | X |
| c. | | Provide pertinent reports for QMC meetings | | X |
| d. | | Attend QMC meetings | X | |
| e. | | Facilitate QMC meetings | | X |
| f. | | Track member grievance and appeals issues | | X |
| g. | | Resolve member grievance and appeals issues as delegated by Client in strict accordance with client's instructions and policies. | | X |
| h. | | Provide for HEDIS tracking and reporting | | X |
| i. | | Integrate HEDIS and other outcomes data | | X |
| j. | | Report performance statistics to Client Medical Director or UM/QM Committee | | X |
| k. | | Communicate Client's performance standards to providers | | X |
| l. | | Administer member satisfaction surveys per NCQA guidelines | | X |
| m. | | Report results of member satisfaction surveys | | X |
| n. | | Administer provider satisfaction surveys per NCQA guidelines | | X |
| o. | | Report results of provider satisfaction surveys | | |
| **4.** | | **POLICIES AND PROCEDURES** | | X |
| a. | | Provide limited consulting services as requested of MHCM Medical Director to <u>assist</u> Client with: | | X |
| | i. | Grievances with Payors relating to medical matters | | X |
| | ii. | Grievances with members relating to medical matters | | X |
| | iii. | Client's physician and hospital referral authorization policies and procedures | | X |
| | iv. | Agenda and discussion at UMC and QMC meetings | | X |
| | v. | Development or updates of clinical protocols, critical pathways and other treatment standards and guidelines | | X |
| | vi. | Other medical matters as requested by Client | X | X |
| b. | | Assist with development or updates of medical management policies | X | X |
| c. | | Assist with development or updates of prospective review guidelines (including hospital pre-certification) | X | X |
| d. | | Assist with development or updates of concurrent review standards and guidelines | X | X |
| e. | | Assist with development or updates of case management program | X | X |

Confidential and Proprietary Meridian Health Care Management, Inc.
NMG Amendment 003 Exhibit B 020801.doc

| | | IPA | MHCM |
|---|---|---|---|
| **D.** | **PROVIDER PANEL MANAGEMENT** | | |
| | **1. PROVIDER CONTRACTING** | | X |
| | a. Identify Client need(s) for new or additional provider(s) | | X |
| | b. Assist Client with recruitment of new or additional providers | | X |
| | c. Review and recommend changes/updates to Client provider applications, contracts and memorandums of understanding | | X |
| | d. Obtain completed provider applications from new providers | | X |
| | e. Present to Client Board of Directors completed provider applications | | X |
| | f. Negotiate provider contracts or memorandums of understanding with new providers at direction of Client | | X |
| | g. Amend current provider contracts or memorandums of understanding at direction of Client | | X |
| | h. Maintain files containing current and historical provider contracts and memorandums of understanding | | X |
| | i. Track renewal dates of provider contracts and memorandums of understanding | | X |
| | j. Negotiate member-specific letters of agreement with non-contracted providers at agreed upon criteria | | |
| | **2. PROVIDER RELATIONS** | | X |
| | a. Maintain database of providers and provider demographics | | X |
| | b. Maintain network participation and/or affiliation | | X |
| | c. Maintain vendor database | | X |
| | d. Maintain Board of Director and shareholder status | | X |
| | e. Maintain providers ability to speak additional languages | | X |
| | f. Audit database of providers and provider demographics | | X |
| | g. Maintain database of open/closed status of providers | | X |
| | h. Generate provider roster as necessary | | X |
| | i. Distribute updated provider roster to Client on monthly or other periodic basis | | X |
| | j. Assist with development and updates of Provider Manuals | | X |
| | k. Produce an distribute Provider Manuals | | X |
| | l. Provide ongoing communication, education, and training to provider and provider office staffs regarding changes to Client policies and procedures | | X |
| | m. Provide ongoing communication, education, and training to provider and provider office staffs regarding changes to Payor contracts | | X |
| | n. Assist with development and updates of provider grievance process | | X |
| | o. Administer provider grievance process | | X |
| | p. Provide telephone line for provider inquiries | | X |
| | q. Answer provider eligibility inquiries | | X |
| | r. Answer provider referral inquiries | | X |
| | s. Answer provider claims inquiries | | X |
| | t. Track key performance standards (e.g. extended office hours, encounters per member, referrals per member, etc.) | | X |
| | u. Develop administrative forms (e.g. referral request) | | X |
| | v. Print administrative forms (e.g. referral request) | | X |
| | w. Distribute administrative forms (e.g. referral request) | | X |
| | x. Develop provider newsletter | | X |
| | y. Print provider newsletter | | X |
| | z. Distribute provider newsletter | | X |
| | **3. PROVIDER CREDENTIALING** | | X |
| | a. Maintain compliance with NCQA standards | | X |
| | b. Process applications for new providers | X | |
| | c. Perform primary source verification | X | |
| | d. Perform site visits | | X |
| | e. Maintain provider application and credential files | | X |
| | f. Maintain computerized database of provider credentialing information | | X |
| | g. Track key identifiers (e.g. license #, DEA #, Medicare #, Tax ID, etc.) | | X |
| | h. Track key statistics (e.g. hospital staff status, board certification status, malpractice insurance data) | X | |
| | i. Perform re-credentialing of current providers | | |
| **E.** | **MEMBERSHIP MANAGEMENT** | | X |
| | **1. ELIGIBILITY VERIFICATION** | | |
| | a. Obtain benefits and eligibility files from Client or Payor, reconcile against existing eligibility data, and load into MHCM system electronically or manually | | |

Confidential and Proprietary Meridian Health Care Management, Inc.
NMG Amendment 003 Exhibit B 020801.doc

| | IPA | MHCM |
|---|---|---|
| | | X |
| b. Maintain member eligibility database | | X |
| c. Identify each member by unique identification number | | X |
| d. Assist with determination of member eligibility for health care services prior to provision of services | | X |
| e. Maintain benefit database to track co-payments, co-insurance, deductibles, other primary health insurance, coverage limitations, lifetime maximum benefits and other benefits by member if supplied by Client or Payor | | X |
| f. Maintain and track eligibility of services for each member | | X |
| g. Allow on-line retrieval through **PRIMEridian DIRECT**™ by provider offices of updated eligibility information | | X |
| h. Generate monthly eligibility reports and distribute monthly to Client and Client providers | | X |
| i. Match benefit coverage to authorization and claim at all points of service | | X |
| j. Maintain eligibility history of each member for retroactive verification | | X |
| k. Administer system for retroactive eligibility verification | | X |
| l. Reconcile retroactive denial of eligibility against Client claims payment process | | X |
| **2. MEMBER SERVICES** | | X |
| a. Provide telephone line for member inquiries | | X |
| b. Answer member eligibility inquiries | | X |
| c. Answer member referral inquiries | | X |
| d. Answer member claims inquiries | | X |
| e. Generate telephone tracking report | | X |
| f. Utilize standard letter to inform members of grievance process | | X |
| g. Issue correspondence acknowledgement letters | | X |
| h. Issue new member welcome letter | | |
| **F. PAYOR CONTRACTING** | | |
| 1. Identify opportunities for risk contracts with Payors, including pre-paid health plans (HMOs), preferred provider organizations, exclusive provider organizations, self-insured employers, employee unions, and indemnity carriers. | X | |
| 2. Negotiate risk contracts with Payors | X | |
| 3. Negotiate risk sharing agreements with Payors, hospitals and other applicable entities | X | |
| 4. Coordinate Client communication with Payors | | X |
| 5. Inform Payors of changes to Client provider roster | | X |
| 6. Provide Payors with current Client provider roster | | X |
| 7. Coordinate expansion of Client provider network to accommodate Payor needs | | X |
| 8. Assist in resolution of grievances between Client and Payor(s) | X | |
| 9. Track renewal dates of Payor contracts | | |
| **G. FINANCIAL MANAGEMENT** | | |
| **1. CAPITATION MANAGEMENT** | | X |
| a. Accept and deposit all capitation payments to Client | | X |
| b. Reconcile capitation payments with available eligibility lists and other pertinent documents | | X |
| c. Produce and distribute capitation payments to capitated primary care physicians | | X |
| d. Produce and distribute capitation payments to capitated specialty physicians, hospitals, and ancillary providers based upon capitation distribution methodology approved by Client | | X |
| e. Provide information to third party Payors for coordination of benefits | | X |
| f. Bill & collect additional reimbursement for insured and reinsured services | | X |
| g. Distribute payments to all fee-for-service providers (in accordance with Article B of this Exhibit) | | X |
| h. Assist Client with development of bonus distribution methodologies | | X |
| **2. RISK POOL ADMINISTRATION** | | X |
| a. Track charges against risk pool(s) | | X |
| b. Generate report of charges against risk pool(s) | | X |
| c. Verify accuracy and validity of risk pool reports generated by Payors or hospital(s) | | X |
| d. Reconcile risk pool surplus(es) or deficit(s) with Payors and hospital(s) | | X |
| e. Pursue timely recovery of all risk pool surpluses | | X |
| f. Negotiate favorable payments terms for Client share of validated deficits | | X |
| **3. BOOKKEEPING AND ACCOUNTING** | | X |
| a. Establish and maintain bookkeeping system for all Client business handled by MHCM | | X |
| b. Establish and maintain accounting system for all Client business handled by MHCM | | X |
| c. Establish and maintain an accounts payable system | | X |
| d. Maintain custody and supervision of business records for all Client business handled by MHCM | | X |
| e. Prepare bills and statements for professional services rendered by Client under contracts | | |

Confidential and Proprietary Meridian Health Care Management, Inc.
NMG Amendment 003 Exhibit B 020801.doc

| | | IPA | MHCM |
|---|---|---|---|
| | managed by MHCM | | X |
| f. | Assist with compilation of reports and forms required by government agencies and Payors | | X |
| g. | Establish and manage Client bank accounts | | |
| **4.** | **FINANCIAL ANALYSIS** | | X |
| a. | On an as needed bases provide flexible pro forma financial modeling, including major operating objectives, anticipated revenues, expenses, and cash flow with assistance of Client. | | |
| b. | Assist Client with determining need for credit lines and/or short-term investments | | X |
| c. | Assist Client with establishing needed credit lines | | X |
| d. | Assist Client with placing short-term Investments | | X |
| e. | Manage short-term investments at the direction of the Client | | X |
| f. | Monitor cash flow and balance sheet for adequate risk reserves | | X |
| **5.** | **REPORTING** | | |
| a. | Generate monthly and YTD balance sheet, income statement, and cash flow statement | | X |
| b. | Generate financial statements on both a cash and an accrual basis | | X |
| c. | Generate monthly and YTD accounts receivable aging report | | X |
| d. | Generate monthly and YTD accounts payable aging report | | X |
| e. | Generate periodic claims lag study (however, not prior to six months of fully paid claims data) | | X |
| f. | Generate monthly report regarding claims status (i.e. open, payable, IBNR) | | X |
| g. | Provide pertinent reports for finance committee meetings | | X |
| h. | Attend finance committee meetings | | X |
| I. | Facilitate finance committee meetings | | X |
| j. | Assist with preparation of audited or unaudited financial statements as prepared by third party when requested by Client | | |
| k. | Generate data and supporting documents required for tax preparation | | X |
| l. | Generate Form 1099 for each provider paid by Client during the calendar year | | X |
| m. | Mail Form 1099 to each provider paid by Client during the calendar year | | X |
| **H.** | **GENERAL ADMINISTRATION** | | X |
| 1. | Supervise and coordinate business aspects of Client's risk contracts | | X |
| 2. | Serve as primary point of contact on behalf of Client | | X |
| 3. | Report directly to Client Board of Directors | | X |
| 4. | Provide 24 hour per day, 7days per week toll-free automated telephone access to MHCM | | X |
| 5. | Provide on-line assistance | | X |
| 6. | Provide ongoing systems support and training | | X |
| 7. | Provide access to Client data an average of 20 hour per day, 7 days per week | | X |
| 8. | Provide recommendations for insurance coverage, including reinsurance, D&O, E&O, professional liability, general liability, workers compensation, and disability | | |
| 9. | Coordinate printing of all forms and letterhead (to be used regarding managed care) on Client stationery (actual cost is passed through to Client) | | X |
| 10. | Process managed care related mail, both incoming and outgoing | | X |
| 11. | Generate ad hoc reports as requested by Client | | X |
| 12. | Coordinate regulatory and payor audits (e.g. NCQA, HCFA) at MHCM and at provider sites and provide NMG with copies of audits and corrective action plans. | | |
| 13. | Provide adequate office space and furnishings for MHCM staff | | X |
| 14. | Recruit and hire and employ with MHCM standard benefits up to 5 employees to be directly supervised by IPA to perform concurrent review/case management/DME/Home Health management services. If IPA should require additional employees, IPA will provide MHCM with sixty (60) days notice. | | |
| 15. | Provide and furnish work space for 5 employees plus IPA Executive and Medical Director in accordance with MHCM standards. If IPA should require additional space, IPA will provide MHCM with sixty (60) days notice. | | X |
| 16. | Provide telephone and telephone service, computer and network access, printer access, fax access, e-mail accounts for 5 employees and IPA Executive and Medical Director (required to provide their own PC acceptable to MHCM). If IPA to require access for additional employees, IPA will provide MHCM with sixty (60) days notice. | | X |

Confidential and Proprietary Meridian Health Care Management, Inc.
NMG Amendment 003 Exhibit B 020801.doc

**Exhibit C**

**Performance Standards**

MHCM agrees to meet the Performance Standards identified below.

| Component | Standard | Performance Measurement | Frequency |
|---|---|---|---|
| Reports | Provide CEO with the following reports on a regular basis | • Physician report Card to be provided quarterly<br>• Specialty Expenses Analysis to be provided monthly<br>• PMPM cost analysis by health plan to be provided monthly<br>• Monthly Claims Data Extract Report to be provided within 5 business days of close of preceding month<br>• Bed Day report to be provided monthly<br>• Bed day log report to be provided daily | Quarterly or monthly as indicated |
| Claims and Encounters | Processing Accuracy | • 98% payment dollar accuracy<br>• 96.5% payment incidence accuracy<br>• 98% administrative accuracy | Annually |
| | Turn around | • 95% of non-contracted clean claims paid/denied within 30 days.<br>• 95% of clean contracted claims paid within 60 calendar days. | |
| | Encounters | • Encounters from capitated providers and PCPs to be input within 15 days of receipt. | Monthly |

Confidential and Proprietary Meridian Health Care Management, Inc.
NMG Amendment 003 020801 Exhibit C and D.doc

| Component | Standard | Performance Measurement | Frequency |
|-----------|----------|-------------------------|-----------|
| | Reporting | • MHCM to provide weekly reporting of claims inventory<br>• MHCM to provide monthly reporting of audit results and claims audit results<br>• MHCM to provide reporting of compliance with performance standards | Weekly or monthly as indicated |
| | Post Payment Review | MHCM to provide CEO with all post payment check runs so that CEO can perform a review | Weekly |
| Utilization Review | Meet the following standards for 95% of authorizations | Emergency: Immediate<br>Urgent: 4 hours<br>Non-urgent: 2 business days | |
| Finance | Reconciliation | Bank reconciliation completed 1 month in arrears with no unresolved amounts | |
| Administration | Contracts | Send contracts out to providers within five days of request and track process. | NA |
| | | Load contracts into MHCM system within 5 days of receipt | NA |
| | | Corrections of contract entry errors to be made within 24 hours of notification | |
| | Eligibility | Updated within 3 business days of receipt | |

Confidential and Proprietary Meridian Health Care Management, Inc.
NMG Amendment 003 020801 Exhibit C and D.doc

**Exhibit D**

**Corrective Action Plan**

1. Any deficiencies in MHCM's performance pursuant to Exhibit B or C shall be identified by IPA and provided to MHCM in writing.
2. MHCM shall review such deficiencies and within 15 calendar days, submit to IPA a corrective action plan ("CAP") which will identify how each deficiency will be corrected and by which date.
3. IPA shall review the CAP and shall have the right to require MHCM to revise the steps MHCM will take to correct the deficiencies or the dates by which the deficiencies will be corrected.
4. All changes that the IPA requires will be provided to MHCM in writing. MHCM shall incorporate such changes into its CAP and shall submit its revised CAP to IPA within five (5) business days.
5. Both parties shall monitor the progress of the corrective action plan. As specified in the CAP, MHCM shall provide periodic written reports regarding its progress.
6. If MHCM does not successfully complete the corrective action plan, IPA shall have the rights set forth in this agreement.

Failure to meet such Performance Standards in accordance with the CAP will result in a monthly payment deduction equal to the amounts listed below. Such payment deduction will be made from the IPA's monthly payment to MHCM for the provision of management services until the deficiency is corrected. At no time shall the cumulative monthly payment deduction exceed 5.00% of the IPA's monthly payment to MHCM.

| | |
|---|---|
| Reports: | 1.00% |
| Claims | 2.00% |
| Administration | 0.50% |
| Utilization Review | 1.00% |
| Finance | 0.50% |

Confidential and Proprietary Meridian Health Care Management, Inc.
NMG Amendment 003 020801 Exhibit C and D.doc

# DEVELOPMENT AND MANAGEMENT AGREEMENT

This AGREEMENT is made and entered into this FIRST day of ~~_____~~, 1999, by and between FAMILY/SENIORS MEDICAL GROUP, a professional corporation (hereinafter referred to as "Client"), with its primary place of business located at 4020 W. Florida Avenue, Suite H, Hemet, California 92545, and MERIDIAN HEALTH CARE MANAGEMENT, INC. a Delaware corporation (hereinafter referred to as "MHCM"), with its primary place of business located at 21045 Califa Street, Woodland Hills, California 91367.

## RECITALS

WHEREAS, Client is a professional corporation in the state of California engaged in the business of providing or arranging for the provision of medical and/or other health care services to its patients; and

WHEREAS, Client intends to contract with one or more Health Maintenance Organizations (HMO) and other third party payors (hereinafter referred to as "Payors") to provide medical services on a capitated and/or fee-for-service basis for patients (hereinafter referred to as "Patients") under such Payor contracts; and

WHEREAS, Client and MHCM recognize that Client has sole and complete responsibility for providing or arranging for the provision of medical and/or other health care services to its patients; and

WHEREAS, MHCM has certain experience in the management of independent practice association (IPA) models of physician organizations and of other risk-sharing health care provider networks; and

WHEREAS, Client is desirous of contracting with MHCM to provide management in the form of development, consulting, and administrative management services as specified herein; and

WHEREAS, MHCM desires to enter into this Agreement with Client to furnish and make available such development, consulting, and administrative management services as herein provided; and

WHEREAS, the parties hereto have reached an agreement for the division of labor necessary to most efficiently provide or arrange for the provision of the medical and/or health care services and managerial services (as described in Exhibit "B" attached hereto) necessary to render medical care to Patients;

NOW, THEREFORE, in consideration of the above Recitals, the terms, covenants and conditions hereinafter set forth, and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

## I
## RELATIONSHIP OF PARTIES

A.   **Independent Contractor Relationship.**  In the performance of the work, duties and obligations described hereunder, it is mutually understood and agreed that each party is at all times acting and performing as an independent contractor with respect to the other and that no relationship of partnership, joint venture or employment is created by this Agreement.  Neither party, nor any other person performing services on behalf of either party pursuant to this Agreement, shall have any right or claim against the other party under this Agreement for social security benefits, workers' compensation benefits, disability benefits, unemployment insurance benefits, health benefits, vacation pay, sick leave or any other employee benefits of any kind.

B.   **Hold Harmless.**  Client and MHCM shall hold each other free and harmless of any and all claims, demands and expenses of all kinds which may result or arise out of any alleged malpractice or neglect caused by Client and/or MHCM, its employees or representatives in the performance or omission of any act or responsibility of Client and/or MHCM pursuant to this Agreement.

## II
## COVENANTS AND OBLIGATIONS OF CLIENT

Client agrees and covenants:

A.   **Payor Contracts.**  Client shall contract with Payors for the provision of medical and/or health care services pursuant to this Agreement.

B.   **Corporate Status.**  Client covenants and agrees that it is presently and shall remain throughout this Agreement and each renewal and extension hereof, a corporation in good standing with the State of California.

C.   **Insurance.**  Client covenants and agrees that it shall obtain and maintain in effect throughout the initial term of this Agreement and each renewal term thereof, such policies of comprehensive general liability insurance and professional liability insurance (including, but not limited to Directors & Officers and Errors & Omissions policies) with coverage as specified and amounts as required by Client's Payor contracts to insure it and its employees against liability for damage directly or indirectly related to the performance of any services provided, the use of any property and facilities provided by Client and activities performed by Client.  Said coverage shall name MHCM as an additional insured and require notice to MHCM

of not less than thirty (30) days written notice of any reduction or cancellation of such insurance coverage by Client. Evidence of the insurance policies described above shall be provided to MHCM upon request.

D. **Medical Services.** Client shall provide or arrange for all of the medical and/or health care services, including, but not limited to the services of, nurses, doctors, clinics and paraprofessionals requisite to fulfill Client's duties and obligations under its Payor contracts.

E. **Payment to MHCM.** Client shall pay to MHCM those amounts set forth in Exhibit "A" hereto for services rendered by MHCM hereunder. Exhibit "A" is attached hereto and incorporated herein by this reference. Said compensation shall be made in accordance with the time frames set forth in Exhibit "A".

F. **Utilization and Quality Management.** Client shall establish, with support and assistance of MHCM, a peer review procedure for effecting proper utilization and quality assessment of Client's providers and facilities.

G. **Confidentiality and Non-disclosure of Information.** Client shall maintain as confidential all financial and other proprietary information of MHCM, including, as example but not limited to policy and procedure manuals, guidelines, etc. Upon termination of this Agreement, or any extensions thereof, all such information will be returned to MHCM and Client shall only retain copies of such information as may be required by law. Client's obligation to maintain the confidentiality of all information obtained from MHCM shall survive the termination of this Agreement.

H. **Compliance with Law.** Client represents and warrants that the practice of medicine at Client's provider's office(s) through the term of this Agreement and any extensions and renewals hereof shall be conducted in accordance with all applicable provisions of federal and state laws and regulations and in a professional manner. Client further represents and warrants that during the term and any extensions and renewals hereof all physicians practicing with Client shall maintain on an unrestricted basis (i) such professional standards and skills as are in accordance with the standards of ethics and practice prevailing in Client's service area, (ii) a license to practice medicine in the State of California, (iii) a Medicare provider number and full participation, accepting assignment, with the Medicare program, and (iv) a federal DEA registration certificate.

I. **Board of Directors Meetings.** Client shall hold regular Board of Director meetings.

J. **Cooperation.** Client covenants and agrees that it shall provide MHCM with all information and the use of such facilities as is required by MHCM to perform its services hereunder. Client further covenants that it shall grant MHCM such authority as necessary to permit MHCM to perform its duties and services hereunder. Such authority shall include without limitation access to individual provider offices and signature authority on Client bank accounts.

III
## COVENANTS & OBLIGATIONS OF MHCM

MHCM agrees and covenants:

A.   Operational Management Services.  In consideration of the compensation described in Exhibit "A" hereof, MHCM shall provide those services described in Exhibit "B" to this Agreement. (Exhibit "B" is attached hereto and hereby incorporated by this reference herein).

B.   Administration of MHCM.  MHCM shall be responsible for employing, training and managing all MHCM staff. Client shall have the right to periodically evaluate any on-site MHCM personnel and report such evaluations to MHCM. However, the hiring, compensation, firing and all other terms of employment for all on-site and off-site MHCM personnel shall be at the sole discretion of MHCM.

C.   Confidentiality and Non-disclosure of Information.  MHCM shall maintain as confidential all financial and other proprietary information of Client.  Upon termination of this Agreement, or any extensions thereof, all such information will be returned to Client and MHCM shall only retain copies of such information as may be required by law. MHCM's obligation to maintain the confidentiality of all information obtained from Client shall survive the termination of this Agreement.

D.   Insurance.  MHCM covenants and agrees that it shall maintain in effect during the initial term and each renewal term thereof, adequate comprehensive general liability and other insurance coverage to cover any loss, liability or damage which may result due to the activities of MHCM or its officers, agents or employees.

IV
## TERM AND TERMINATION OF AGREEMENT

A.   Term.  Subject to Sections IV(B) and Exhibit A(1), the effective date of this Agreement shall commence on the first (1ˢᵗ) day of November, 1999, and shall continue in effect for two (2) years from such date.  The Agreement shall automatically renew for additional periods, each of two (2) years; provided, however, either party may terminate this Agreement with or without cause by giving written notice to the other of its intent to terminate this Agreement at least six (6) months prior to the expiration of the initial two (2) year or prior to any two (2) year renewal period of this Agreement.

B.   Termination with Cause.  Notwithstanding the foregoing, this Agreement may be terminated by either party (i.e., the non-defaulting party) by giving notice to the other party if the other party is in default of this Agreement. The following shall constitute events of default hereunder:

   1. Failure by either party to perform, keep or fulfill any material covenant, undertaking, obligation, condition, or service set forth in this Agreement and the continuance of any such default for a period of sixty (60) days after receipt of written notice of such failure by the defaulting party.

2. Failure of a party to pay any amount that may become due hereunder for a period of five (5) days after written notice of such failure.

3. Cancellation of insurance required by either party herein.

4. Client's practice of medicine is deemed unlawful by any state or federal agency.

5. Any representations or warranties made herein by either party are false or incorrect.

6. MHCM's legal counsel concludes that any provision of this Agreement is unlawful.

7. Either party files a voluntary petition for relief under the United States Bankruptcy Code, 11 U.S.C. § 101, et seq., as amended from time to time (the "Bankruptcy Code") or otherwise seeks relief under any similar federal or state statute for the protection of debtors; makes an assignment of its assets for the benefit of creditors; has its assets seized or encumbered by creditors under any federal or state law; or has an involuntary case commenced against it under the Bankruptcy Code or similar state or federal statute, provided however that the commencement of an involuntary case against such party shall not constitute a default hereunder if the involuntary case is dismissed within sixty (60) days of filing.

## V
## DISPUTES/ARBITRATION

A.    **Arbitration.** Any controversy or claim arising out of or relating to this Agreement or the breach thereof shall be settled by binding arbitration in accordance with the rules of commercial arbitration of the American Arbitration Association and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. Such binding arbitration shall occur within the County of Los Angeles. The arbitrator(s) may in any such proceeding award attorneys' fees and costs to the prevailing party.

## VI
## MISCELLANEOUS

A.    **Notices.** All notices required to be given hereunder shall be in writing and shall be deemed delivered if personally delivered or dispatched by certified or registered mail, return receipt requested, postage prepaid, addressed to the parties as follows. Notice shall be deemed given on the date it is deposited in the mail in accordance with the foregoing. Any party may change the address to which to send notices by notifying the other party of such change of address in writing in accordance with the foregoing.

| | |
|---|---|
| Client: Attn: President | MHCM: Attn: President |
| Family/Seniors Medical Group | Meridian Health Care Management |
| 4020 W. Florida Avenue, Suite H | 21045 Califa Street |

Hemet, CA 92545                              Woodland Hills, CA  91367

B.   **Amendment.** This agreement may be modified only by mutual agreement of the parties provided that, before any modification shall be operative or valid, it be reduced to writing and signed by both parties.

C.   **Management Services Exclusivity.** It is agreed and understood that Client will use MHCM exclusively for all services specified in Exhibit "B" of this Agreement.

It is further agreed and understood that prior to entering into an agreement with any other person or entity to provide services for Client in addition to any of those required to be performed by MHCM that are set forth in this Agreement, Client will notify MHCM of such intent, in writing, and MHCM will have the first right of refusal to provide these additional services, at additional compensation no less than the compensation proposed to Client in any bona fide offer from such other person or entity. Such right of first refusal shall expire sixty (60) days after Client presents to MHCM a bona fide offer from a third party qualified to provide such additional services.

D.   **Severability.** If any provision of this Agreement shall be determined to be illegal or invalid for any reason, the remaining provisions shall continue in full force and effect unless the illegality or invalidity prevents the accomplishments of the essential objectives and purposes of this Agreement.

E.   **Assignability.** This Agreement shall not be assigned, sublet or transferred by MHCM or Client without the prior written consent of the other. Such consent shall not be unreasonably withheld. Subject to the foregoing, this Agreement shall inure to the benefit of and be binding on Client and MHCM, their executors and administrators, including any person or entity which affiliates, merges or acquires substantially all of the assets of Client or MHCM, or into which Client may be consolidated or otherwise combined.

F.   **Change in Law.** In the event of any change of law, rule or regulation by Federal or State Governments which relate to the relationship, as outlined herein, by effect of such new law, rule or regulation or code changes in any way makes this Agreement in its entirety illegal or improper, this Agreement may be terminated by either party. In the event of such termination, the parties hereto expressly agree to renegotiate the terms of this Agreement in order to ensure compliance with any such change of law.

G.   **Transition.** In the event of termination, MHCM agrees to cooperate in an orderly transfer of management as prescribed by Client.

H.   **Non-Solicitation.** The parties agree that during the term of this agreement and for a period of one year following termination of this agreement, neither party will directly or indirectly solicit any employee or patients of the other to accept employment with that party or any of its affiliated entities or individuals.

I.   **Governing Law.** This Agreement shall be interpreted, construed and governed by and in accordance with the laws of the State of California.

J.   **Waiver.** The failure of either party to insist upon the strict adherence to any term of this Agreement on any occasion shall not be considered a waiver or deprive that

party of the right thereafter from enforcing that term or any other term of this Agreement.

K.   **Entire Agreement**. This Agreement is the complete and exclusive statement of the agreement between the parties and supersedes all prior or contemporaneous proposals, oral or written, understandings, representations, conditions, covenants and all other circumstances between the parties relating to the subject matter of this Agreement.

L.   **Captions and Headings**. The captions and headings throughout this Agreement are for convenience of reference only and shall in no way be held or deemed to be a part of or affect the interpretation of this Agreement.

M.   **No Third Party Beneficiaries**. Nothing in this Agreement, expressed or implied, is intended or shall be construed to confer upon any person, firm or corporation other than the parties hereto and their respective successors or assigns, any remedy or claim under or by reason of this Agreement or any term, covenant or condition hereof, as third party beneficiaries or otherwise, and all of the terms, covenants and conditions hereof shall be for the sole and exclusive benefit of the parties hereto and their successors and assigns.

N.   **Confidentiality of Terms**. During the initial term and any renewal terms of this Agreement, the parties shall maintain all terms and conditions of this Agreement as confidential. No disclosure shall be permitted without the approval of the other party. Additionally, MHCM shall not disclose to any third party any confidential information regarding Client records, patients, or plans, except as required by Federal, California or local law/regulation, or as required by any Payor contract executed by Client. However, MHCM shall have the right to display Client name in listings of its clients.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement on the day and year first hereinabove set forth.

CLIENT:

BY: _____   DATE: 12-27-99

TITLE: President

MHCM:

Meridian Health Care Management, Inc., a Delaware Corporation

BY: _____   DATE: 1/5/00

Michael K. Alper

TITLE: President

Meridian Health Care Management, Inc. Management Agreement
FSMO Mgmt Proposal 111099.doc

_____   Client/ FSMO
            Initials

Page 7 of 13

party of the right thereafter from enforcing that term or any other term of this Agreement.

K.   **Entire Agreement**. This Agreement is the complete and exclusive statement of the agreement between the parties and supersedes all prior or contemporaneous proposals, oral or written, understandings, representations, conditions, covenants and all other circumstances between the parties relating to the subject matter of this Agreement.

L.   **Captions and Headings**. The captions and headings throughout this Agreement are for convenience of reference only and shall in no way be held or deemed to be a part of or affect the interpretation of this Agreement.

M.   **No Third Party Beneficiaries**. Nothing in this Agreement, expressed or implied, is intended or shall be construed to confer upon any person, firm or corporation other than the parties hereto and their respective successors or assigns, any remedy or claim under or by reason of this Agreement or any term, covenant or condition hereof, as third party beneficiaries or otherwise, and all of the terms, covenants and conditions hereof shall be for the sole and exclusive benefit of the parties hereto and their successors and assigns.

N.   **Confidentiality of Terms**. During the initial term and any renewal terms of this Agreement, the parties shall maintain all terms and conditions of this Agreement as confidential. No disclosure shall be permitted without the approval of the other party. Additionally, MHCM shall not disclose to any third party any confidential information regarding Client records, patients, or plans, except as required by Federal, California or local law/regulation, or as required by any Payor contract executed by Client. However, MHCM shall have the right to display Client name in listings of its clients.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement on the day and year first hereinabove set forth.

CLIENT:

BY: _____   DATE: 12-27-99
TITLE: President

MHCM:
Meridian Health Care Management, Inc., a Delaware Corporation

BY: _____   DATE: 1 5 00
Michael K Alpert

TITLE: President

Meridian Health Care Management, Inc. Management Agreement
FSMG Mgmt Proposal 111099.doc

_____ Client: FSMG
Initials

## EXHIBIT "A"
### COMPENSATION

MHCM shall be compensated as follows:

A.   Commencing on November 1, 1999 MHCM shall receive from Client monthly payment equal to:

- twelve percent (12%) of the initial $250,000.00 of Client gross monthly revenue, including but not limited to capitation payments, distributions from risk pools, risk sharing arrangements, and reinsurance recoveries; and

- eleven and one-half percent (11.5%) of Client gross monthly revenues greater than $250,000.00

B.   The monthly fee paid to MHCM for providing Operational Management Services as described in Exhibit "B" hereof shall be a minimum of Ten Thousand Dollars ($10,000.00) per month.

C.   All expenses directly related to the performance of services under Article III of this Agreement shall be borne by MHCM, excluding the following:

1   Client legal expenses.
2.   Accounting expenses for year-end taxes, such as preparation of 1099 forms, audits and special accounting services other than the day-to-day operation of Client.
3.   Client Board, committee and Medical Director fees
4.   Design, printing and duplication expenses for medical encounter and referral forms, Client stationery, newsletters and other marketing materials.
5.   Client insurance premiums, including but not limited to: reinsurance, directors and officers, professional or general liability, and as approved by Client.
6.   Costs incurred, with prior approval of Client, for Client's membership, Board or committee meetings, excluding costs for routine preparation of information packets, presentation materials and other routine items.
7.   Space rent, furnishings and equipment for office space located within Client's primary service area (as defined in Article III, Section B of this Agreement) and used by MHCM to perform the services required under this Agreement.
8.   Postage and other special handling expenses (e.g. certified mail or overnight mail) for provider and/or health plan required notification or per client request.
9.   A seventy-five dollar ($75.00) fee per Client provider every two years for primary source credentialing at appointment and reappointment.
10.   A one hundred-fifty dollar ($150.00) fee per Client provider every two years for office site audits for purposes of credentialing or re-credentialing.

D.   Unless provided for otherwise herein, Client shall remit payment to MHCM within thirty (30) days of the close of the month in which services were rendered.

**REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK**

EXHIBIT "B"

## OPERATIONAL MANAGEMENT SERVICES TO BE PROVIDED BY MHCM

**A.   General Management and Administration.**

1.   Supervising and coordinating day-to-day non-medical business aspects of Client.

2.   Providing administrative support for interface with physicians, including voice mail access to MHCM staff at any time. Making best efforts to return as quickly as possible Client voice mail messages, including voice mail messages received outside of normal business hours.

3.   Assist Client in the provision of medical, administrative, peer review and utilization management services to Client, including, but not limited to:

   a.   Consulting on Payor/Client communications pertinent to medical matters.

   b.   Assisting in resolving any grievances between Client and Payors pertinent to all medical matters.

   c.   Consulting on resolving Client/Payor Member grievances pertinent to medical matters.

   d.   Consulting on Client's medical and hospital referral authorization procedures.

   e.   Interfacing with Client provider's office staff to monitor Client's medical and hospital referral authorization procedures.

   f.   Coordinating medical administrative support prior to and at all Utilization Management and Quality Management Committee Meetings.

4.   Providing clerical and secretarial support adequate to meet functions of Client, its employees and its Board of Directors.

5.   Coordinating printing of all forms and correspondence.

6.   Processing all incoming and outgoing mail.

7.   Maintaining a liaison with Payors where necessary to obtain/submit data, etc.

8.   Preparing ad-hoc reports as requested by Client.

9.   On-going provision of computerized management information system.

**B.   Financial Management.**

1.   Establishing bookkeeping and accounting systems including the maintenance, custody and supervision of all of Client's business records and the preparation, distribution and recordation of all bills and statements for professional services rendered by Client, including billing and completion of reports and forms required by prepaid health plans, employers, insurance companies, governmental agencies and other third party payors.

2. Establishing a budget that reflects major operating objectives and anticipated revenues, expenses and cash flow.

3. Establishing and maintaining bank accounts and supervising short-term investments and money management.

4. Preparing financial statements on a monthly basis to include a balance sheet, statement of revenue and expenses, and cash flow for Client's operations for such month and a statement of accounts receivable. Such statements to be produced on both a cash and accrual basis of accounting.

5. Establishing and maintaining an accounts payable system.

6. Administering a claims processing system, including, but not limited to:

   a. Receiving completed claim forms from Client providers.

   b. Entering data in computerized database.

   c. Generating reports required by Payors.

   d. Adjudicating and paying claims pursuant to Client's instructions and policies.

   e. Reviewing available cash versus payable claims.

   f. Generating reports required by Client for utilization management and financial review.

7. Administering capitation distribution from prepaid Payors, including but not limited to:

   a. Receiving and depositing capitation payments.

   b. Reconciling capitation payments with eligibility lists and other pertinent reports.

   c. Preparing budgets for internal Client management.

   d. Distributing primary care physician ("PCP") capitation payments and explanation of benefits.

   e. Distributing specialty physician payment based upon authorized referrals and explanation of benefits.

   f. Producing reports and collecting reimbursement for insured and reinsured services.

   g. Providing third party payor information for coordination of benefits.

   h. Distributing payments to all ancillary and administrative providers.

   i. Preparing monthly, quarterly, and yearly financial statements and accounting protocols.

8. Assistance in developing bonus distribution methodologies.

C. **Risk Pool Administration (If data is provided by Payors or Providers).**
1. Entering charges against risk pool(s) in computerized database.
2. Generating reports of charges against risk pool(s).
3. Verifying accuracy and validity of reports produced by Payors.
4. Reconciling risk pool(s) accounts with Payors and any internal arrangement between hospital and Client.

D. **Management Information System.** Provide a management information system to include the handling of accounts receivable, accounts payable, patient tracking, claims processing, utilization analysis, and eligibility determination.

E. **Insurance and Risk Management.**
1. Providing recommendations regarding professional liability insurance, comprehensive liability insurance, workers' compensation insurance and disability insurance
2. Coordinating Client's risk management program.

F. **Patient Eligibility.**
1. Obtaining eligibility lists from Payors.
2. Assisting with determination of eligibility of patients for health care coverage prior to provision of medical services.
3. Maintaining computerized eligibility database.
4. Reconciling retroactive denial of eligibility against provision of medical services and authorization process by Client against appropriate health care benefit agreement.
5 Administering system for retroactive eligibility determination.
6. Distributing eligibility reports to appropriate Client providers, hospital staff and Client.

G. **Provider Recruitment.** Assist in recruiting and credentialing new providers who shall contract with or be employed by Client.

H. **Client Provider Data.**
1. Obtaining approved Client provider applications from Client.
2. Negotiating agreements with Client providers.
3. Presenting complete provider applications and contracts for Client approval.
4. Maintaining data in computerized eligibility database.
5. Tracking client provider contract renewal dates.
6. Distribution of updated Client provider lists, as appropriate.

I.   Provider Relations.

  1. Providing resources to train Client providers in Medical group's policies and procedures.

  2. Distributing Client's forms to Client providers.

  3. Assisting Client in development and updating of a Client manual.

J.   Education.

  1  Educating physicians regarding Client's polices and procedures.

  2. Educating of Patients of Client regarding third party payors.

  3. Coordinating health education and wellness programs to Patients of Client.

K.   Managed Care Contracting.

  1. Negotiating agreements with third party payors including, but not limited to, prepaid health plans, preferred provider organizations, exclusive provider organizations, self-insured employers, employee unions and indemnity carriers.

  2. Negotiating agreements with hospital and ancillary providers within Client service area.

  3. Tracking contract renewal dates for agreements with third party payors.

L.   Liaison with Third Party Payors Contracting with Client.

  1. Coordinating communications with third party payors.

  2. Providing third party payors with rosters of physicians in Client.

  3. Informing third party payors of roster changes.

  4. Coordinating Client network and office expansion to meet requirements of third party payors.

  5. Assisting in resolving any grievances between Client and third party payors.

  6. Assisting in resolving patient grievances.

M.   Utilization Management, Quality Management and Medical Policy Committee Functions.

  1. Administering managed care medical and hospital referral authorization procedure.

  2. Designing, developing and implementing a physician education program and claims analysis program.

  3. Providing administrative assistance prior to and at all managed care Utilization Management, Quality Management and Medical Policy Committee Meetings (e.g. meeting schedules, set-up, agenda, minutes).

  4. Providing administrative support when applicable at each managed care Utilization Management Committee meeting pertinent to health benefits, billing information, referral authorization process, referral and practice patterns,

compliance with referral authorization process, referral limitations, monitoring of coding procedures and utilization guidelines.

5. Providing administrative support for all managed care Quality Management activities as they relate to non-medical policy and procedure development, data collection, meeting administration, documentation of finds, monitoring of Client developed requirements for medical record documentation.

6. Designing, developing and implementing a comprehensive Client provider credentialing program subject to the fee set forth in Exhibit A, Section E.

7. Providing administrative support for the managed care Medical Policy Committee as it relates to non-medical policy and procedure development, meeting administration, documentation of finds, and consistent application of non-medical adopted polices.

## REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK



## Mutual Non-Disclosure Agreement

This MUTUAL NON-DISCLSOURE AGREEMENT (the "Agreement") entered into this THIRD day of OCTOBER, 2002 is by and between Meridian Health Care Management, Inc. (MHCM) with its principal place of business located at 6200 Canoga Avenue, Woodland Hills, CA 91367, Family/Seniors Medical Group, with its principal place of business located c/o MHCM 6200 Canoga Avenue, Woodland Hills, CA 91367, and Rancho Family Medical Group, Inc. with its principal place of business located at 41715 Winchester Road, Suite 101, Temecula, CA 92590.

Whereas, each party hereto has requested or may request information from the other party in connection with consideration of a possible transaction or relationship between the parties;

Whereas, in the course of consideration of the possible transaction or relationship, each party hereto has disclosed or may disclose confidential, important and/or proprietary trade secret information concerning that party's business and activities;

Therefore, the parties hereto agree to enter into a confidential relationship with respect to the disclosure by each of them of certain information as follows:

### 1. Definitions.

For purposes of this Agreement, "Confidential Information" shall include all information or material that has or could have commercial value or other utility in the business or prospective business of the Disclosing Party or its subsidiaries or affiliates.   Confidential information also includes all information of which unauthorized disclosure could be detrimental to the interests of the Disclosing Party or its subsidiaries or affiliates whether or not such information is identified as Confidential Information.   By example and without limitation, Confidential Information includes, but is not limited to, any and all information of the following or similar nature, whether or not reduced to writing:  Customer lists, customer and supplier identities and characteristics, agreements, marketing knowledge and information, sales figures, pricing information, marketing plans and business plans, strategies, forecasts, financial information, budgets, software, research papers, projections, procedures, routines, quality control and manufacturing procedures, patents, patent applications, processes, formulas, trade secrets, innovations, inventions, discoveries, improvements, research or development and test results, data, know-how, formats, plans, sketches, specifications, drawings, models, and any other information or procedures that are treated as or designated secret or confidential by the Disclosing Party or its customers or potential customers.

For purposes of this Agreement, the term "the Disclosing Party" shall be the party that discloses Confidential Information to the Receiving Party.

1



For purposes of this Agreement, the term "the Receiving Party" shall be the party that receives Confidential Information from the Disclosing Party and shall include the Receiving Party, the company he or she represents, and all affiliates, subsidiaries, and related companies of the Receiving Party.

For purposes of this Agreement, the term "Representative" shall include each party's directors, officers, employees, agents, and financial, legal, and other advisors.

2. **Exclusions.**  Confidential Information does not include information that the Receiving Party can demonstrate: (a) was in the Receiving Party's possession prior to its being furnished to the Receiving Party under the terms of this Agreement, provided the source of that information was not known by the Receiving Party to be bound by a confidentiality agreement with or other obligation of confidentiality to the Disclosing Party; (b) is now, or hereafter becomes, through no act or failure to act on the part of the Receiving Party, generally known to the public; (c) is rightfully obtained by the Receiving Party from a third party, without breach of any obligation to the Disclosing Party; or (d) is independently developed by the Receiving Party without use of or reference to the Confidential Information.

3. **Confidentiality.** The Receiving Party and its Representatives shall not disclose any of the Confidential Information in any manner whatsoever, except as provided in paragraphs 4 and 5 of this Agreement, and shall hold and maintain the Confidential Information in strictest confidence.

4. **Permitted Disclosures.** The Receiving Party may disclose the Disclosing Party's Confidential Information to the Receiving Party's responsible Representatives with a bona fide need to know such Confidential Information, but only to the extent necessary to evaluate or carry out the proposed transaction or relationship with the Disclosing Party and only if such employees are advised of the confidential nature of such Confidential Information and the terms of this Agreement and are bound to protect the confidentiality of such Confidential Information.

5. **Required Disclosures.** The Receiving Party may disclose the Disclosing Party's Confidential Information if and to the extent that such disclosure is required by court order, provided that the Receiving Party provides the Disclosing Party a reasonable opportunity to review the disclosure before it is made and to interpose its own objection to the disclosure.

6. **Use.** The Receiving Party and its Representatives shall use the Confidential Information solely for the purpose of evaluating the possible transaction or relationship with the Disclosing Party and shall not in any way use the Confidential Information to the detriment of the Disclosing Party. Nothing in this Agreement shall be construed as granting any rights to the Receiving Party, by license or otherwise, to any of the Disclosing Party's Confidential Information.



7. **Return of Documents.** If the Receiving Party does not proceed with the possible transaction or relationship with the Disclosing Party, the Receiving Party shall notify the Disclosing Party of that decision and shall, at that time or at any time upon the request of the Disclosing Party for any reason, return to the Disclosing Party any and all records, notes, and other written, printed or other tangible materials in its possession pertaining to the Confidential Information. The returning of materials shall not relieve the Receiving Party from compliance with the terms and conditions of this Agreement.

8. **Additional Agreements.** Neither the holding of discussions nor the exchange of material or information shall be construed as an obligation of either party to enter into any other agreement or prohibit either party from providing the same or similar information to others and entering into agreements with others. Each party reserves the right, in its sole discretion, to reject any and all proposals made by the other party or its Representatives with regard to a transaction between them and to terminate discussions and negotiations at any time. Additional agreements of the parties, if any, shall be in writing signed by both parties.

9. **Irreparable Harm.** The Receiving Party understands and acknowledges that any disclosure or misappropriation of any of the Confidential Information in violation of this Agreement may cause the Disclosing Party irreparable harm, the amount of which may be difficult to ascertain and therefore agrees that the Disclosing Party shall have the right to apply to a court of competent jurisdiction for specific performance and/or an order restraining and enjoining any such further disclosure or breach and for such other relief as the Disclosing Party shall deem appropriate.

10. **Survival.** The secrecy and non-use obligations under the terms of this Agreement shall, for a period of five (5) years, survive the expiration or termination of this Agreement.

11. **Successors and Assigns.** This Agreement and each party's obligations hereunder shall be binding on the representatives, assigns, and successors of such party and shall inure to the benefit of the assigns and successors of such party; provided, however, that the rights and obligations of the parties hereunder are not assignable.

12. **Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of California.

13. **Attorney's Fees.** If any action at law or in equity is brought to enforce or interpret the provisions of this Agreement, the prevailing party in such action shall be awarded its attorneys' fees and costs incurred.

14. **Counterparts and Right.** This Agreement may be signed in counterparts, which together shall constitute one agreement.

3



**15. Entire Agreement.** This Agreement expresses the full and complete understanding of the parties with respect to the subject matter hereof and supercedes all prior or contemporaneous proposals, agreements, representations and understandings, whether written or oral, with respect to the subject matter. This Agreement is not, however, to limit any rights that either party may have under trade secret, copyright, patent or other laws. This Agreement may not be amended or modified except in writing signed by each of the parties to the Agreement. This Agreement shall be construed as to its fair meaning and not strictly for or against either party. The headings hereof are descriptive only and are not to be construed in interpreting the provisions hereof.

Accepted And Agreed To By:
Meridian Health Care Management, Inc.

By: _____

Title: __Executive Vice President__

Date: _____

Accepted And Agreed To By:
Family/Seniors Medical Group, Inc.

By: _____

Title: __President__

Date: _____

Accepted And Agreed To By:

By: _____

Title: _____

Date: __10/2/02__

4

*contract file*

## Amendment of Agreement

This Amendment is entered into this twenty-sixth (26th) day of July, 1999, by and between Meridian Health Care Management, Inc. a Delaware Corporation ("MHCM, Inc."), Meridian Health Care Management, LP, a Delaware Limited Partnership ("MHCM, LP"), Meridian Health Care Consulting, Inc. ("MHCC"), and Family Medical Group ("Client").

### RECITALS

WHEREAS, Client entered into an agreement with Medical Management Associates, Inc., a California Corporation ("MMA"), or MHCM, LP originally effective November 1, 1993, and amended as recorded, wherein MMA or MHCM, LP provides certain services specified in the agreement and its amendments, if any, ("MSA") to Client; and,

WHEREAS, the assets of MMA including the MSA and all rights, responsibilities and obligations thereto, were contributed to MHCM, LP as of June 1, 1996; and,

WHEREAS, the assets of MMA, including the MSA and all rights, responsibilities and obligations thereto, were acquired by MHCC as of January 29, 1999; and,

WHEREAS, MHCC and MHCM, LP, including the MSA and all rights, responsibilities and obligations thereto, were acquired by MHCM, Inc. as of July 26, 1999; and,

WHEREAS, the parties hereto desire to continue in full and effect the MSA and its amendments, if any, between Client and MHCM, Inc.

NOW, THEREFORE, in consideration of the above Recitals, the terms, covenants and conditions hereinafter set forth, and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

### ASSIGNMENT

1. Client hereby assigns the MSA, and its amendments, if any, including all rights, responsibilities and obligations thereto, to MHCM, Inc.

2. MHCM, Inc. hereby assumes all rights, responsibilities and obligations of the MSA, and its amendments, if any.

IN WITNESS WHEREOF, the parties hereto have duly executed this Amendment on the day and year first hereinabove set forth.

### SIGNATURES CONTINUED ON NEXT PAGE

## AMENDMENT #1
## TO MANAGEMENT AGREEMENT

This Amendment is entered into by and between MERIDIAN HEALTH CARE MANAGEMENT, LP (MHCM) and FAMILY/SENIORS MEDICAL GROUP, IPA (Client) as of the FIRST (1st) day of November, 1998 amending the Management Agreement entered into by the parties on November 1, 1996.

The parties hereby agree that:

1.  Exhibit A COMPENSATION is amended to include a new Section C.8. as follows:

    C.8.  A one hundred twenty-five-dollar ($125.00) fee per Client provider office site visit audit as delegated and required by health plans.

2.  All other provisions not inconsistent herein shall remain in full force and effect.

By:

Meridian Health Care Management, LP:
a Delaware Limited Partnership
by Medical Management Associates, Inc.
a California Corporation, its General Partner

_____
Signature
Dolores Blanco Ross
Executive Vice President

Date: __11/2/98_____

By:

FAMILY/SENIORS MEDICAL
GROUP, IPA

_____
Signature
Larry C. Hughes, M.D.
President

Date: ____10/30/98_____

**CLIENT:**

BY: _Larry C Hughes MD_                     DATE: _8-3-99_
Larry Hughes, MD

TITLE: _President_

**MHCM, LP**
Meridian Health Care Management, LP, a Delaware Limited Partnership, by,
**MHCC**
Meridian Health Care Consulting, Inc., a California Corporation, its General Partner

And,

**MHCM, Inc.**
Meridian Health Care Management, Inc., a Delaware Corporation

BY: _____                     DATE: _8/6/99_
Michael J. Alber

TITLE: President

**REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK**

## PROOF OF SERVICE

I, the undersigned, say:  I am over the age of 18 years and not a party to the within action or proceeding.  My business address is 225 South Lake Avenue, Suite 1400, Pasadena, California 91101.

On September 24, 2007, I served the foregoing documents described as follows:

### COUNTERCLAIMS AND CROSS-CLAIMS OF DEFENDANTS NORTHRIDGE MEDICAL GROUP, INC. AND FAMILY/SENIORS MEDICAL GROUP, INC.

on all interested parties in this action by placing a true copy thereof enclosed in a sealed envelope addressed to each of the following:

**See attached Service List, incorporated by this reference**

and served each as follows:

[ ] **BY MAIL**– I caused to be deposited such envelope for collection and mailing in the United States Mail at Pasadena, California, with first class postage thereon fully prepaid, in accordance with the business practice at my place of business for collection and processing of correspondence for mailing with the United States Postal Service, with which practice I am readily familiar.  Under that practice, such correspondence is deposited with the United States Postal Service at Pasadena, California on the same day in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postage cancellation date or postage meter date is more than one (1) day after the date of deposit for mailing in affidavit.

[ ] **BY PERSONAL SERVICE**– ( ) I delivered by hand, or ( ) I caused to be delivered by messenger service, such envelope to the offices of the addressee with delivery time prior to 5:00 p.m. on the date specified above.

[ ] **BY FACSIMILE TRANSMISSION**– I caused such document to be transmitted to the offices of the addressee via facsimile machine, prior to 5:00 p.m. on the date specified above.

[ X ] **BY OVERNIGHT DELIVERY**– I caused to be deposited such envelope in an envelope or package designated by an express service carrier with delivery fees paid or provided for and addressed to the person to be served as above set forth, in a box or other facility regularly maintained by such express service carrier, prior to the time listed thereon for pick-up.  Hand delivery was guaranteed by the next business day.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on September 24, 2007 at Pasadena, California

___Connie V. Branson___

## SERVICE LIST
### (In Re Meridian Health Care Management, Inc.)

United States Trustee (SV)                                    **U.S. Trustee**
21051 Warner Center Lane, Suite 115
Woodland Hills, CA 91367
Facsimile: 818-716-1576
Attn.: Margeaux Ross, Esq.

David R. Hagan, Esq.                                          **Trustee**
Merritt & Hagen
6320 Canoga Avenue, Suite 1400
Woodland Hills, CA 91367
Facsimile: 818-992-3309

Steven T. Gubner, Esq.                                        **Attorney for Trustee**
Barak Vaughn, Esq.
Ezra/Brutzkus/Gubner LLP
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367
Facsimile: 818-827-9099

Meridian Health Care Services, Inc.                          **Debtor**
6200 Canoga Avenue
Woodland Hills, CA 91367

Debra I. Grassgreen, Esq.                                    **Attorney for Debtor**
Pachulski Stang Ziehl Young Jones & Weintraub LLP
150 California Street, 15th Floor
San Francisco, CA 94111-4500
Facsimile: 415-263-7010

**Defendant Brian Sato:**

Brian Sato
1223 Paseo Sombra
San Dimas, CA 91773

Mark T. Hiraide, Esq.
Petillon & Hiraide, LLP
    21515 Hawthorne Blvd., Ste. 1260
Torrance, CA 90503
Fx. 310-543-0550  [mhiraide@corplawp-h.com]

**Attorneys for Plaintiff e4e Incorporated in Case No. BC 345617:**

Tyler A. Baker, Esq.
Donald W. Searles, Esq.
Fenwick & West LLP
Silicon Valley Center
801 California Street
Mountain View, CA 94041
Fax: 650-938-5200  [tbaker@fenwick.com; dsearles@fenwick.com]

**Attorneys for Defendants Nautic Partners LLC; Chisholm Partners IV, L.P.; Fleet Equity
Partners VI, L.P.; Fleet Venture Resources, Inc.; Kennedy Plaza Partners II, LLC:**

Mark A. Nadeau, Esq.
DLA Piper US LLP
2415 E. Camelback Road, Suite 700
Phoenix, AZ 85016
Fax: 480-606-5101
[mark.nadeau@dlapiper.com]

Sara L. Chenetz, Esq.
DLA Piper US LLP
1999 Avenue of the Stars, 4th Floor
Los Angeles, CA 90067-6023
Fax: 310-595-3300
[sara.chenetz@dlapiper.com]

**Attorneys for Defendant Scott Hilinski:**

John K. Rubiner, Esq.
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks & Lincenberg, APC
1875 Century Park East, 23rd Floor
Los Angeles, CA 90067-2561
Fax. 310-201-2110  [jkr@birdmarella.com]

Sarah E. Walters, Esq.
Nutter McClennen & Fish LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA 02210-2604
Fax. 617-310-9459  [swalters@nutter.com]

**Attorneys for Defendant Michael Alper:**

James A. Kohn, Esq.
Moldo Davidson Fraioli Seror
& Sestanovich LLP
2029 Century Park East, Suite 1600
Los Angeles, CA 90067
Fax. 310-551-0238  [jkohn@mdfslaw]